No. 15-55449

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NML CAPITAL, LTD.,

*Plaintiff-Appellant*,

v.

SPACE EXPLORATION TECHNOLOGIES CORP.,
a.k.a. SPACEX, a Delaware corporation;
and THE REPUBLIC OF ARGENTINA, a foreign state,
including its *COMISIÓN NACIONAL DE ACTIVIDADES ESPACIALES*,
a political subdivision of the Argentine State, a.k.a. CONAE,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
Case No. 2:14-cv-02262-SVW-Ex
The Honorable Stephen V. Wilson

## BRIEF FOR APPELLANT NML CAPITAL, LTD.

HAROLD A. BARZA
BRUCE E. VAN DALSEM
IAN S. SHELTON
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: 213.443.3000
Facsimile: 213.443.3100

THEODORE B. OLSON
MATTHEW D. MCGILL
SCOTT P. MARTIN
CHRISTOPHER B. LEACH
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Counsel for Plaintiff-Appellant NML Capital, Ltd.*
[*additional counsel listed on inside cover*]

STEVEN A. ENGEL
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone: 212.698.3500
Facsimile: 212.698.3599

ALEXANDER K. MIRCHEFF
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7307
Facsimile: 213.229.6307

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel state that Plaintiff-Appellant NML Capital, Ltd. is not publicly traded and has no corporate parent, and that no publicly held corporation owns ten percent or more of its stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT .............................................................4

ISSUES PRESENTED..................................................................................6

STATUTORY ADDENDUM .......................................................................6

STATEMENT OF THE CASE......................................................................7

    A.    The Foreign Sovereign Immunities Act................................7

    B.    Argentina's Default And NML's Judgments Against Argentina .........8

    C.    Argentina's National Space Activities Commission ("CONAE") .....................................11

    D.    Argentina Acquires Launch Services Rights With SpaceX................13

    E.    NML's Efforts To Attach Argentina's Launch Services Rights And The District Court Proceedings .....................................15

SUMMARY OF ARGUMENT ...................................................................18

STANDARD OF REVIEW .........................................................................21

ARGUMENT ..............................................................................................22

I.    The Launch Services Rights Are "Used For A Commercial Activity In The United States." ...................................................................22

    A.    Argentina Is Using Its Contractual Launch Services Rights. ............23

        1.    Argentina's Launch Services Rights Include Ongoing Pre-launch Services...........................................23

        2.    Argentina Is Currently Using The Launch Services Rights To Secure Future Commercial Services......................27

    B.    Argentina's Usage Is "Commercial Activity."...................31

ii

**TABLE OF CONTENTS**
(continued)

**Page**

II.  NML May Attach Assets Held In CONAE's Name To Satisfy
     Judgments Entered Against Argentina. ........................................34

     A.   The "Core Functions" Test Governs Separate Legal Personhood
          For Purposes Of Liability And Jurisdiction Under The FSIA. ...........35

     B.   Under The Core Functions Test, CONAE Is Not A Separate
          Legal Person Because Its Primary Function Is Governmental,
          Rather Than Commercial. ................................................43

CONCLUSION ................................................................46

STATEMENT OF RELATED CASES ................................................47

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*,
    475 F.3d 1080 (9th Cir. 2007) ................................................................. *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................. 22, 27

*Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*,
    280 F.3d 901 (9th Cir. 2002) ................................................................. 21

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
    875 F.2d 1174 (5th Cir. 1989) ................................................................. 28

*Cherry Cotton Mills v. United States*,
    327 U.S. 536 (1946) ................................................................. 40

*Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*,
    361 F.3d 676 (2d Cir. 2004) ................................................................. 37, 39, 40, 42

*Connecticut Bank of Commerce v. Republic of Congo*,
    309 F.3d 240 (5th Cir. 2002) ................................................................. 29

*Corzo v. Banco Cent. de Reserva del Peru*,
    243 F.3d 519 (9th Cir. 2001) ................................................................. 33

*EM Ltd. v. Republic of Argentina*,
    389 F. App'x 38 (2d Cir. 2010) ................................................................. 11

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007) ................................................................. 8, 22

*EM Ltd. v. Republic of Argentina*,
    720 F. Supp. 2d 273 (S.D.N.Y. 2010) ................................................................. 10

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ................................................................. *passim*

*Garb v. Republic of Poland*,
    440 F.3d 579 (2d Cir. 2000) ................................................................. *passim*

iv

# TABLE OF AUTHORITIES
### *(cont.)*

Page(s)

*Gov't of Jamaica v. United States*,
770 F. Supp. 627 (M.D. Fla. 1991) .................................................45

*Harris v. Amgen, Inc.*,
770 F.3d 865 (9th Cir. 2014) ..........................................................21

*Hebbe v. Pliler*,
627 F.3d 338 (9th Cir. 2010) ..........................................................25

*Hess v. Port Auth. Trans-Hudson Corp.*,
513 U.S. 30 (1994) ..........................................................................40

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
507 U.S. 163 (1993) ........................................................................21

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ..................................................... 26, 30

*Magness v. Russian Fed'n*,
247 F.3d 609 (5th Cir. 2001) .................................................. 36, 37, 46

*Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Sys., Inc.*,
495 F.3d 1024 (9th Cir. 2007) ................................................. *passim*

*Mohamed v. Jeppesen Dataplan, Inc.*,
579 F.3d 943 (9th Cir. 2009) ..........................................................21

*NML Capital, Ltd. v. Republic of Argentina*,
680 F.3d 254 (2d Cir. 2012) ...........................................................11

*NML Capital, Ltd. v. Republic of Argentina*,
699 F.3d 246 (2d Cir. 2012) ........................................................9, 10

*NML Capital, Ltd. v. Republic of Argentina*,
727 F.3d 230 (2d Cir. 2013) ..................................................... 1, 10, 43

*NML Capital, Ltd. v. SpacePort Sys. Int'l, L.P.*,
No. 11-cv-3507 (C.D. Cal.) .............................................................26

## TABLE OF AUTHORITIES
### *(cont.)*

Page(s)

*Republic of Argentina v. NML Capital, Ltd.*,
  134 S. Ct. 2250 (2014) .................................................................. *passim*

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) ...................................................................... *passim*

*Roeder v. Islamic Republic of Iran*,
  333 F.3d 228 (D.C. Cir. 2003) ...................................................... 37, 45

*SerVaas Inc. v. Republic of Iraq*,
  No. 10-828-CV, 2011 WL 454501 (2d Cir. Feb. 10, 2011) ......................... 37, 38

*Sheppard v. David Evans & Assoc.*,
  694 F.3d 1045 (9th Cir. 2012) ...................................................... 22

*Sun v. Taiwan*,
  201 F.3d 1105 (9th Cir. 2000) ...................................................... 33, 34

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
  30 F.3d 148 (D.C. Cir. 1994) ........................................................ *passim*

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) .................................................................. 7, 39

*Wah Chang v. Duke Energy Trading & Marketing, LLC*,
  507 F.3d 1222 (9th Cir. 2007) ...................................................... 21

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ...................................................... 21

*Wye Oak Tech., Inc. v. Republic of Iraq*,
  666 F.3d 205 (4th Cir. 2011) ........................................................ 36, 37, 38

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
  135 F.3d 658 (9th Cir. 1998) ........................................................ 30

### Statutes

28 U.S.C. § 1291 ...................................................................... 5

28 U.S.C. § 1330 ...................................................................... 4

# TABLE OF AUTHORITIES
### (*cont.*)

Page(s)

28 U.S.C. § 1603 ................................................................ *passim*

28 U.S.C. § 1604 ....................................................................4, 7

28 U.S.C. § 1605 ......................................................... 4, 7, 37, 39

28 U.S.C. § 1606 .........................................................................8

28 U.S.C. § 1608 .......................................................................37

28 U.S.C. § 1609 ....................................................................4, 8

28 U.S.C. § 1610 ............................................................. *passim*

42 U.S.C. § 18312 .....................................................................44

## Rules

9th Cir. R. 28-2.7 ......................................................................6

Fed. R. Civ. P. 12 ................................................................ 16, 30

## Other Authorities

Andrew Liptak, io9, *The History (and Future) of Commercial Space Flight* .........44

CONAE, *About CONAE* ........................................................44

CONAE, *Objectives* ...............................................................12

CONAE, *Satellite Missions* ...................................................46

Draft Articles on Responsibilities of States for Internationally Wrongful Acts ................................................................ 40, 41

Elana Duggar *et al.*, *The Role of Holdout Creditors and CACs in Sovereign Debt Restructurings*, Moody's Investor Serv. (Apr. 10, 2013) ............................9

SpaceX, *SpaceX Successfully Completes First Mission to Geostationary Transfer Orbit* (Dec. 3, 2013) ...............................................14

## INTRODUCTION

For more than a decade, NML Capital, Ltd. has attempted to enforce judgments entered by the United States District Court for the Southern District of New York against the Republic of Argentina arising from Argentina's strategic default on billions of dollars in its bonds.  *See Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2253 (2014) ("*NML III*").  Since the judgments were entered, Argentina has openly defied federal judges in court proceedings and, indeed, embarked on a public campaign "criticiz[ing] the 'justice system'" of the United States for issuing the judgments and other rulings against it.  *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 238 & n.4 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2819 (2014) ("*NML II*").  Rather than make good on those judgments, Argentina has spirited much of its property away from the United States in an attempt to evade creditors' efforts to attach assets as permitted by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*.

But Argentina still conducts business in the United States, and in 2014, NML located Argentine property in the United States:  Post-judgment discovery revealed that Argentina, through its space agency *Comisión Nacional de Actividades Espaciales* ("CONAE"), had contracted with Space Exploration Technologies Corp. ("SpaceX") to launch two satellites in September 2015 and September 2016 using SpaceX's rockets, and to employ SpaceX's pre-launch services to ensure

1

successful launches. Argentina's ongoing dealings with SpaceX constitute commercial activity for purposes of the FSIA because they are "the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). Indeed, SpaceX provides identical services to private commercial actors. Argentina's rights under its contracts with SpaceX ("Launch Services Rights"), which obtain for Argentina both SpaceX's valuable pre-launch services and the launches themselves, thus are being "used for a commercial activity in the United States" and may be attached by NML under the FSIA. 28 U.S.C. § 1610(a).

NML brought suit in the United States District Court for the Central District of California, seeking to attach Argentina's Launch Services Rights with the aim of re-marketing them to partially satisfy its outstanding judgments. The district court, however, dismissed NML's action. Applying this Court's "core functions" test, the district court correctly concluded that CONAE is a "political subdivision" of the Argentine state that is bound by Argentina's waivers of immunity and liable for its debts. But without examining the contracts themselves, the court concluded that Argentina was not yet "using" the contractual Launch Services Rights and that the rights therefore could not be attached under Section 1610(a).

The district court erred. The decision below overlooked well-supported factual allegations that Argentina now is "using" its rights under the contracts to ob-

tain pre-launch services.  In particular, the Complaint alleges that Argentina is currently collaborating with SpaceX to ensure that SpaceX's launch vehicles are compatible with Argentina's satellites and to complete the extensive preparations required prior to launch.  ER 63-64 ¶¶ 29-33.  Those preparations are occurring only because Argentina is entitled to them under its contracts.  Argentina thus is "using" its Rights under its contracts and doing so in the United States.

The decision also contravened this Court's leading decision on Section 1610(a)—*Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007) ("*Af-Cap*")—which makes clear that a sovereign's property is used for a commercial activity when that property is used to secure future commercial services, a test that the Launch Services Rights plainly satisfy.  The district court's conclusion that Argentina would not be "using" its Launch Services Rights until SpaceX begins the launch process cannot be reconciled with *Af-Cap*'s conclusion that use of a letter of credit to secure future performance constitutes *present use* for a commercial activity.  Argentina's use of its Launch Services Rights to reserve its opportunities to launch satellites in the future similarly constitutes *present use* of the Launch Services Rights.  This Court should correct the district court's misapplication of the FSIA and reverse the judgment of dismissal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. § 1330 because Argentina voluntarily waived its jurisdictional immunity and immunity from attachment or execution under 28 U.S.C. §§ 1605(a)(1) and 1610(a)(1) respectively, and because CONAE is a political subdivision of Argentina pursuant to 28 U.S.C. § 1603(a)(1).

In the Fiscal Agency Agreement governing the bonds on which NML's judgments are based, Argentina "irrevocably waive[d] and agree[d] not to plead any immunity from the jurisdiction of any . . . court to which it might otherwise be entitled" in any action to enforce a judgment based on the bonds. 28 U.S.C. §§ 1604, 1605(a)(1); ER 59 ¶ 16. Argentina also waived any immunity from attachment or execution that might apply to its "revenues, assets or properties" in an action to enforce a judgment against it based on the bonds. 28 U.S.C. §§ 1609, 1610(a)(1); *NML III*, 134 S. Ct. at 2253 n.1, 2256; *see also* ER 59 ¶ 16.

The district court had jurisdiction over claims against CONAE because, as a "political subdivision" of Argentina, 28 U.S.C. § 1603(a), CONAE's immunities under the FSIA are derivative of and coterminous with Argentina's immunities. "A foreign state is nothing more than the sum of its parts"; it exists "only through its head of state, its ministries, and the myriad administrative offices that collectively embody a sovereign state." *Ministry of Defense & Support for the Armed*

4

*Forces of the Islamic Republic of Iran v. Cubic Defense Sys., Inc.*, 495 F.3d 1024, 1035 (9th Cir. 2007) ("*Cubic*"), *rev'd sub nom. on other grounds*, *Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009). The FSIA refers to such governmental entities as "political subdivision[s]." *See* 28 U.S.C. § 1603(a). Under "the 'core functions' test" for identifying political subdivisions, CONAE is bound by Argentina's waivers of immunity because it "is 'an integral part of [Argentina's] political structure,'" as opposed to "'an entity whose structure and function is predominantly commercial.'" *Cubic*, 495 F.3d at 1034-35 (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994)).

Because, as the district court recognized, "CONAE's core functions are governmental," CONAE is Argentina's political subdivision, and thus Argentina's "waiver of immunity speaks for [CONAE] as well." ER 10. *See infra* Part II.B. The district court thus had jurisdiction over this creditor suit against Argentina and its political subdivision CONAE.

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final order dismissing NML's action on March 6, 2015. *See* ER 13. NML timely filed its notice of appeal on March 24, 2015. ER 15-16.

5

## ISSUES PRESENTED

Under Section 1610(a) of the FSIA, the property of a foreign state or its political subdivisions may be attached to satisfy an unpaid judgment if the property is "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). Property is "used" for "a commercial activity" when it is or is intended to be "put into action, put into service, availed or employed" for the type of activity by which private parties commonly engage in trade and commerce. *Af-Cap*, 475 F.3d at 1091 (emphasis omitted). NML's Complaint pleads that, through its space agency CONAE, Argentina contracted with SpaceX—a private, for-profit satellite launch services company—for Launch Services Rights, and that Argentina is using those rights both to obtain pre-launch services now, and to secure launch services in the near future. NML accordingly sought to attach the rights in partial satisfaction of the judgments that it holds against Argentina. The issue presented for appeal is: whether the Complaint alleges that the Launch Services Rights are used for a commercial activity under Section 1610(a) of the FSIA.

## STATUTORY ADDENDUM

Pursuant to Circuit Rule 28-2.7, pertinent statutory provisions are reproduced in an addendum to this brief.

6

## STATEMENT OF THE CASE

### A.    The Foreign Sovereign Immunities Act

The FSIA "contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983); *see also NML III*, 134 S. Ct. at 2255. Section 1603(a) of the FSIA defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Unlike an "agency or instrumentality," which is a "separate legal person," *id.* § 1603(b), a "political subdivision" is an integral part of the state, bound by the state's waivers of sovereign immunity and liable for its debts, *see Cubic*, 495 F.3d at 1034-35; *see also infra* Part II.

Under Section 1604 of the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607." 28 U.S.C. § 1604. Among other exceptions, the FSIA includes a waiver provision: "A foreign state shall not be immune from the jurisdiction of courts of the United States" where "the foreign state has waived its immunity either explicitly or by implication." *Id.* § 1605(a). If that provision—or any other exception to a foreign state's jurisdictional immunity from suit—applies, then "a federal district court may exercise subject matter jurisdiction," *Verlinden*, 461 U.S.

at 489, and, except for punitive damages, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606.

Separate, non-jurisdictional provisions of the FSIA govern post-judgment attachment and execution. Section 1609 provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611." 28 U.S.C. § 1609. Section 1610, in turn, provides several exceptions to attachment immunity, including circumstances when property is "used for commercial activity in the United States." *Id.* § 1610(a); *see also infra* Part I.B.

## B. Argentina's Default And NML's Judgments Against Argentina

In 1994, Argentina began issuing bonds pursuant to a Fiscal Agency Agreement ("FAA" and "FAA Bonds"). To entice creditors familiar with Argentina's "history of defaulting on, or requiring restructuring of, its sovereign obligations," *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007), Argentina expressly waived its sovereign immunity from suit and "consent[ed] generally for the purposes of the Foreign Sovereign Immunities Act to the giving of any relief or the issue of any process," *NML III*, 134 S. Ct. at 2253 n.1; *see also* ER 3 ("Argentina had long ago waived its sovereign immunity in connection with its bonds."). Specifically, in the FAA, Argentina "irrevocably waive[d] and agree[d] not to

8

plead any immunity from the jurisdiction of any . . . court to which it might otherwise be entitled" in any action to enforce a judgment based on the FAA Bonds. ER 59 ¶ 16. Argentina also waived any immunity that might otherwise apply to its "revenues, assets or properties" in an action to enforce a judgment based on the FAA Bonds. ER 59 ¶ 16.

In December 2001, Argentina announced a payment moratorium on more than $80 billion of public-sector debt, including the FAA Bonds, and triggered what was then the largest sovereign debt default in history. *See* ER 59 ¶ 16; *see also* ER 2-3. In 2005, and again in 2010, Argentina attempted to restructure its defaulted debt by issuing new bonds that it promised to pay in exchange for the defaulted bonds. *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 252-53 (2d Cir. 2012) ("*NML I*"). But rather than negotiate in good faith with its creditors, Argentina adopted a negotiating posture "unique in its unilateral and coercive approach to . . . debt restructuring." Elana Duggar *et al.*, *The Role of Holdout Creditors and CACs in Sovereign Debt Restructurings*, Moody's Investor Serv. 2 (Apr. 10, 2013), *available at* https://www.moodys.com/researchdocumentcontentpage .aspx?docid=PBC_15016. Argentina offered its creditors a take-it-or-leave-it offer of roughly 25 to 29 cents on the dollar and vowed that it would never make payment on bonds that did not participate in the restructurings; indeed, its legislature even passed a series of laws codifying this threat. *NML I*, 699 F.3d at 252-53.

NML holds beneficial interests in the FAA Bonds. ER 59 ¶ 16; *see also* ER 2-3. NML declined to participate in Argentina's exchange offers, ER 3, and Argentina since has steadfastly refused to make any payments to NML even though it "has the ability to pay," *EM Ltd. v. Republic of Argentina*, 720 F. Supp. 2d 273, 301 (S.D.N.Y. 2010); *see also NML II*, 727 F.3d at 246. NML sued on the bonds in the United States District Court for the Southern District of New York, and that court has entered five money judgments in NML's favor, totaling (with interest) more than $1.7 billion. ER 56, 58-59 ¶¶ 1, 11-14.

Argentina does not dispute that these judgments are valid and enforceable. Yet Argentina repeatedly has "made clear its intention to defy any money judgment issued by" United States courts, *NML II*, 727 F.3d at 241, and "simply refuse[s] to pay," *NML I*, 699 F.3d at 262. In addition, "Argentina's officials have publicly and repeatedly announced their intention to defy any rulings of [United States courts] with which they disagree." *NML II*, 727 F.3d at 238 & n.4.

To frustrate NML's efforts to enforce the judgments, Argentina has spirited its assets outside the United States and elaborately structured its financial affairs. *See NML III*, 134 S. Ct. at 2253; ER 56 ¶ 2. Argentina has divided its governmental functions among numerous purportedly independent entities in an effort to shield assets with claims that they are not property of the Argentine state. For example, Argentina placed funds used to pay for infrastructure improvements into a

10

trust account held by a state-owned bank as trustee; although Argentina continued to control the use of the funds, Argentina claimed that the trust constituted a separate entity under Argentine law. United States courts have rejected these subterfuges and allowed attachment of Argentine assets. *See EM Ltd. v. Republic of Argentina*, 389 F. App'x 38, 40, 42 (2d Cir. 2010) (permitting attachment of these funds because, under New York law, the trust was not "a valid trust"); *NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 256, 258 (2d Cir. 2012) (permitting attachment of "a New York bank account owned by . . . a sub-unit of Argentina's Ministry of Science, Technology, and Productive Innovation" used to pay for scientific equipment).

## C.    Argentina's National Space Activities Commission ("CONAE")

This action seeks attachment of Argentine property nominally held by CONAE. CONAE was established in 1991 and endowed with the "national authority" to "centralize, organize, manage, and execute an overall space policy." ER 60-61 ¶ 20 (quoting ER 78); *see also* ER 1-2. CONAE's enabling act declares that the "advance of space science and technology are of great interest for the National State," and that "[t]he technical complexity of space activities makes essential an appropriate organization and coordination of all national entities, both private and public, related to said activities, to prevent scattering and overlapping of efforts." ER 60-61 ¶ 20 (quoting ER 77-78). Thus, CONAE is tasked with "propos[ing] and

implement[ing] a National Space Program, considered state policy, in order to use space science and technology for peaceful purposes." CONAE, *Objectives*, http://www.conae.gov.ar/index.php/english/objectives123 (last visited May 9, 2015).

To further its mission, CONAE performs a number of official duties, such as developing national space projects; coordinating all activities of Argentina's National Space Program, including any involvement by public and private institutions; conducting research; arranging for the international exchange of space technologies; entering into agreements with foreign and domestic entities; and promoting international cooperation. ER 60-62 ¶¶ 20-24; *see also* ER 2. CONAE also is charged with implementing multiple treaties to which Argentina is a party. ER 61 ¶ 22.

CONAE is under the direct control of the Argentine government. Its Board of Directors reports "'directly and exclusively' to Argentina's president, who must approve the National Space Plan as well as its financing mechanism." ER 2 (citing ER 50-51 ¶ 4; ER 62 ¶ 24; ER 78). Eight of the nine members of its Board of Directors are governmental appointments: The Minister of Foreign Relations and Religion is the Chairperson; the Secretary of Foreign Relations is the Vice-Chairperson; and six members of the Board are selected by the Argentine president. ER 62 ¶ 24; ER 79-80.

12

CONAE is financially dependent on the Argentine state. ER 2 (citing ER 61-62 ¶ 23; ER 80). It is funded annually by the Argentine National Congress, and, to receive that funding, it must prepare an annual budget subject to congressional approval. ER 2 (citing ER 61-62 ¶ 23; ER 80). Moreover, CONAE's international activities must conform to Argentine foreign-policy objectives, and the Ministry of Foreign Relations and Religion may intervene in any international cooperation attempted by CONAE. ER 2 (citing ER 79).

**D. Argentina Acquires Launch Services Rights With SpaceX**

Through CONAE, Argentina participates in an international space mission to study the global environment. ER 3 (citing ER 42-43 ¶¶ 4-5). To further this mission over the next two years, CONAE plans to launch satellites from sites in the United States to observe climatological and environmental phenomena. ER 3 (citing ER 42-43 ¶ 4; ER 63 ¶ 30). For this purpose, CONAE has contracted with Los Angeles-based SpaceX to launch at least two satellites—in September 2015 and September 2016—aboard SpaceX Falcon 9 launch vehicles from the SpaceX launch facility at California's Vandenberg Air Force Base, and to obtain various pre-launch services. ER 3 (citing ER 63 ¶ 30; ER 88-89).

SpaceX is in the business of providing commercial space transport. ER 64 ¶¶ 32-33. According to a recent SpaceX press release, more than 60 percent of its scheduled launches are for non-governmental customers. ER 64 ¶ 32 (citing

13

SpaceX, *SpaceX Successfully Completes First Mission to Geostationary Transfer Orbit* (Dec. 3, 2013), http://www.spacex.com/press/2013/12/03/spacex-successfully-completes-first-mission-geostationary-transfer-orbit). Private companies such as Thaicom, ORBCOMM, Iridium, and Bigelow Aerospace have contracted with SpaceX to procure launch services, just as Argentina has done through CONAE. ER 64 ¶ 33; ER 88-91.

Entities that contract with launch-services providers like SpaceX receive not only the rights to use the provider's rockets on a certain date, but also the rights to related "launch services." ER 63-64 ¶¶ 29-33. A satellite launch requires extensive pre-launch preparations to ensure that the satellite will work as intended with the launch vehicle. ER 27-28 ¶¶ 6-7. Preparations for a satellite launch normally begin eighteen to twenty-four months before the opening of the scheduled "launch period" (*i.e.*, the three-month time period around the scheduled launch). ER 27 ¶ 6. Typically, fifteen months before the launch period, the launch-services provider should receive the satellite's parameters, including its mass and desired orbital parameters (*e.g.*, the size, shape, and orientation of the desired orbit), in addition to other information. ER 27 ¶ 6. The launch-services provider must use this data to assess the satellite's compatibility with the launch vehicle and, if needed, to make or recommend adjustments to the launch vehicle or satellite. ER 27-28 ¶¶ 6-7. To complete this critical compatibility assessment, the launch-services provider

typically will communicate with the holder of the launch-services rights on a regular basis regarding various technical issues, including issues that may require redesigning the satellite. ER 27-28 ¶¶ 6-7.

Because Argentina's scheduled September 2015 launch is fewer than four months away, Argentina and SpaceX doubtless are in regular communications regarding the upcoming launch. Preparations also likely are underway for Argentina's scheduled September 2016 launch. Although Argentina has refused to produce its contracts with SpaceX, *see* ER 22, Argentina has acknowledged that "as time progresses," SpaceX's preparations for the launches "become more uniquely tailored to CONAE's specific satellites," Opp'n to Mot. to Expedite 3, CA9 D.E. 13, thus conceding that Argentina is currently using its contractual rights to procure SpaceX's "launch services," *see* ER 63-64 ¶¶ 29-33.

### E. NML's Efforts To Attach Argentina's Launch Services Rights And The District Court Proceedings

Argentina's contractual Launch Services Rights are the property sought by NML's lawsuit. On March 25, 2014, NML brought this action to attach Argentina's Launch Services Rights with SpaceX, ER 56-57 ¶¶ 1-4, including both the rights to launch the satellites and the rights to required "launch services" prior to the launch, ER 56-57, 63-65 ¶¶ 3, 6, 7, 29-34, 39. NML's suit does not seek to attach the satellites Argentina has contracted to launch; it seeks to attach only Argentina's contractual rights to receive launch services from SpaceX.

15

NML alleged that both Argentina and CONAE were subject to the district court's jurisdiction: Argentina waived its jurisdictional immunity under the FSIA, ER 58-59 ¶¶ 9, 16; and, because CONAE is a "political subdivision" of Argentina, CONAE also was subject to jurisdiction, and its property may be seized to satisfy NML's judgments against Argentina, ER 59-62 ¶¶ 15-26. NML further alleged that Argentina's Launch Services Rights were not immune from attachment or execution under 28 U.S.C. § 1610(a)(1) because Argentina acquired those rights as part of a commercial transaction with SpaceX, and Argentina was currently using those rights for commercial activity in the United States. ER 63-65 ¶¶ 27-34.

Argentina moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Argentina argued that the district court lacked jurisdiction over the claims against CONAE because CONAE supposedly was an "agency or instrumentality" of Argentina and that Argentina's waiver of immunity thus did not apply to CONAE. It also argued that NML had not adequately alleged that Argentina was "using" the Launch Services Rights, and thus NML could not satisfy the "used for a commercial activity" requirement for Section 1610(a)(2)'s exception to the FSIA's attachment immunity.

The district court held a hearing on Argentina's motion on June 30, 2014. The court focused on whether Argentina was using the Launch Services Rights for a commercial activity: It opened the hearing by asking counsel whether the prop-

16

erty at issue was "a contract to reserve a spot with SpaceX to launch a satellite for Argentina." ER 33:7-8. Argentina's counsel, however, did not have copies of the contracts available, and indeed stated that he "ha[d] not seen the contract[s]." ER 33:11. SpaceX's counsel also did not bring copies of the contracts to the hearing for the Court to review, ER 34:17-18, but nonetheless represented various facts about the content of those written documents, ER 34:2-35:2. NML contended that the contracts "giv[e] [Argentina] certain right[s] now that [it is] exercising," that the contracts "restric[t] SpaceX's ability to offer that launch site to someone else," and that discovery likely would show that, pursuant to the contract, "there are on-going interactions between SpaceX and Argentina." ER 36:24-37:3.

NML asked the district court to permit limited discovery directed towards establishing these facts. ER 20. Specifically, NML sought Argentina's contracts with SpaceX and evidence of the parties' ongoing performance of those contracts. *See* ER 22, 31. In support of its motion, NML provided a declaration from satellite-launch consultant Keith Volkert, who explained that, in a launch-services contract like SpaceX's, the launch-services provider gives the satellite owner rights to extensive pre-launch services beginning at least eighteen months before the launch period. ER 27-28 ¶ 6.

On March 6, 2015, the district court granted Argentina's motion to dismiss, ER 13, and denied as moot NML's request for discovery, ER 14. The district court

17

first concluded that it had jurisdiction over the claims against CONAE. The court explained that, under the "core functions" test adopted by this Court in *Cubic*, because CONAE is an administrative agency with no financial independence and is directly controlled by the Argentine government, CONAE is a "political subdivision" of Argentina rather than a legally distinct "agency or instrumentality." ER 1-2, 8-10. Accordingly, Argentina's waiver of jurisdictional immunity under the FSIA encompasses CONAE. ER 10.

The district court determined, however, that Argentina's Launch Services Rights are not subject to attachment under 28 U.S.C. § 1610(a) on the ground that Argentina had not yet "used" those Rights. ER 10-12. The district court believed that Argentina would not use its Rights "until the launch process begins." ER 12. The district court therefore concluded that the Launch Services Rights are immune from attachment and execution, and accordingly dismissed NML's Complaint. ER 13.

## SUMMARY OF ARGUMENT

**I.** The district court erred when it concluded that Argentina was not using its Launch Services Rights for a commercial activity in the United States. *See* 28 U.S.C. § 1610(a).

Argentina is "using" its contractual Launch Services Rights for commercial activity in at least two ways. *First*, Argentina now is using—and will continue to

18

use—its Launch Services Rights to obtain required pre-launch services from SpaceX, which "are the *type* of actions" that "private part[ies]" routinely engage in to launch satellites. *Weltover*, 504 U.S. at 614. Because of the lengthy and complex preparations required to launch a satellite, launch-services rights must be pressed into service long before the launch process—typically beginning eighteen to twenty-four months prior to the scheduled launch. Argentina's upcoming September 2015 and September 2016 launches—less than four and sixteen months away, respectively—are well within this window, and the Complaint more than plausibly alleges that Argentina is currently using these rights to evaluate and, if necessary, customize SpaceX's rockets to fit Argentina's satellites.

*Second*, Argentina also is actively using the Launch Services Rights to keep the launch slots open and to secure future services for itself. As this Court recognized in *Af-Cap*, a foreign sovereign "uses" its contractual rights when it "secure[s] the services of an American corporation" for future work. 475 F.3d at 1092. Argentina is doing exactly that here: Its Launch Services Rights lock up the right to use SpaceX's commercial launch services.

**II.** Argentina cannot resist attachment on the ground that the Launch Services Rights are nominally held by CONAE. CONAE is not an "agency or instrumentality" separate and distinct from Argentina. Rather, because its core functions

19

are governmental, CONAE is a "political subdivision" of Argentina that shares Argentina's waiver of immunity and is liable for Argentina's debts.

Governmental entities, or "political subdivision[s]"—including CONAE—are inseparable from the state for all purposes, including liability. *See Garb v. Republic of Poland*, 440 F.3d 579, 596 (2d Cir. 2000). Under the dichotomy embraced by the Supreme Court, this Court, and numerous other courts of appeals, these "political subdivision[s]" "count as part of the state itself." *Transaero*, 30 F.3d at 151-52.

The "core functions" test governs whether a governmental entity is a separate "agency or instrumentality" or, instead, a "political subdivision" indistinct from the foreign sovereign. *Cubic*, 495 F.3d at 1035-37. Under that test, if an entity is "an integral part of a foreign state's political structure," then it is viewed as the foreign state itself, rather than a separate legal person, even when it engages in commercial activity; by contrast, if an entity's "structure and function is predominantly commercial," then it is viewed as an agency or instrumentality and is considered a separate legal person from the foreign state. *Id.* at 1034 (quoting *Transaero*, 30 F.3d at 151).

Under the core functions test, CONAE is indistinct from Argentina because its primary function is governmental, not commercial. CONAE manages Argentina's National Space Program, plays an important role in executing Argentina's

20

foreign policy, and is financially and politically bound to Argentina. CONAE thus is a "political subdivision" of Argentina, and NML may attach CONAE's assets to satisfy judgments against Argentina.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to accept subject matter jurisdiction. *Wah Chang v. Duke Energy Trading & Marketing, LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007). The Court may consider extrinsic evidence when ruling on a motion to dismiss for lack of subject matter jurisdiction. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). To the extent that the district court makes factual findings relevant to its determination of subject matter jurisdiction, the Court reviews those findings for clear error. *Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 280 F.3d 901, 904 (9th Cir. 2002).

This Court also reviews *de novo* a district court's decision to dismiss a complaint for failure to state a claim. *Harris v. Amgen, Inc.*, 770 F.3d 865, 874 (9th Cir. 2014). In assessing the legal sufficiency of a complaint, the Court must accept the factual allegations of the complaint and attached documents as true, and draw all reasonable inferences in favor of the plaintiff. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir. 2009). The Court must reverse the judgment of dismissal if the plaintiff's allegations contain "factual con-

tent that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining what inferences are reasonable "is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1051 (9th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679).

## ARGUMENT

### I.    The Launch Services Rights Are "Used For A Commercial Activity In The United States."

The property of a foreign state or its political subdivisions is attachable in aid of execution upon a judgment if it (a) is "used for a commercial activity in the United States," and (b) meets one of seven other requirements, including waiver of immunity from attachment by the foreign state. 28 U.S.C. § 1610(a). As to the latter requirement, Argentina "indisputably waived its assets' immunity from attachment under 28 U.S.C. [§] 1610(a)(1)." *EM Ltd.*, 473 F.3d at 481 n.18. And, because Argentina's waiver also binds CONAE, *see infra* Part II.B, the sole remaining question under Section 1610(a) is whether the property at issue is "used for a commercial activity in the United States." Because Argentina (through CONAE) is "using" its Launch Services Rights both to obtain pre-launch services now and to secure launch services in the future, and that usage constitutes "commercial activi-

ty," the Launch Services Rights are attachable under Section 1610(a). The district court thus erred by dismissing NML's Complaint.

### A. Argentina Is Using Its Contractual Launch Services Rights.

Under this Court's holding in *Af-Cap*, a sovereign's property is "use[d]" when the property "is put into action, put into service, availed or employed." 475 F.3d at 1091 (emphasis omitted). NML's Complaint plausibly alleged that Argentina is availing itself of its contractual Launch Services Rights. Indeed, if Argentina were *not* using its contractual Launch Services Rights, SpaceX would not now be engaged in preparations to launch Argentina's satellites, and Argentina would have no expectation of launching satellites in September 2015 and September 2016. But, because Argentina is putting its contractual rights into service, it does have launch slots and SpaceX is customizing its launch vehicles to conform to Argentina's satellites. Argentina is using its contractual rights.

### 1. Argentina's Launch Services Rights Include Ongoing Pre-launch Services.

Most obviously, the Launch Services Rights are being "used for" commercial activity because Argentina has been drawing on them—and will continue to draw on them—to obtain pre-launch services from SpaceX that are necessary to launch satellites into orbit. These are the same pre-launch services that any private company contracting with SpaceX would use to prepare for and to launch a satellite into orbit.

a.    The Complaint and supporting documents make clear that Argentina's rights under the Launch Services Contracts include extensive pre-launch services. Indeed, the Complaint is replete with references to Argentina's rights not only to launch its satellites on certain dates, but also to "launch *services*" under the contracts. ER 64 ¶¶ 32-33 (emphasis added). Because launching a satellite is a complicated endeavor, SpaceX spends months or years preparing a satellite for launch. *See* ER 64 ¶ 32; ER 95 (noting that, "at press time" in October 2013, SpaceX "was preparing" to launch satellites in the following September 2014); ER 27-28 ¶¶ 6-7 (preparatory steps "begin eighteen to twenty-four months prior to the opening of the scheduled launch period").

The Complaint alleges that Argentina is "using" these pre-launch services *now*. For example, one of Argentina's launches is scheduled to take place a mere four months from now. ER 63 ¶ 30 (citing ER 89). Because the preparatory steps necessary to launch Argentina's satellites on SpaceX's latest launch vehicle will take many months, SpaceX is currently working with Argentina to ensure that SpaceX's rocket is compatible with Argentina's payload; these are among "the launch services to be provided to CONAE by SpaceX." ER 64 ¶ 32.[1]

---

[1] SpaceX introduced the Falcon v.1.1 (the version of the Falcon 9 used in Argentina's launches) only last year. *See* ER 64 ¶ 32; ER 95. Use of a new rocket model generally requires additional preparation and more extensive testing.

b.    The district court was required to accept the facts pleaded by NML as true and also to accept *all* of the plausible inferences from those facts when viewed "in the light most favorable to" NML. *Hebbe v. Pliler*, 627 F.3d 338, 340 (9th Cir. 2010). Among those inferences is that the ongoing "launch services" entailed work by SpaceX months and years before the actual launches to prepare to launch Argentina's satellites on SpaceX's new rocket model. Indeed, even without the contracts (which NML requested, but was denied, *see* ER 31 (RFP 6)), NML put forth evidence that the "launch services" SpaceX provided in the Contracts included extensive pre-launch preparations. *See* ER 27-28 ¶ 6.[2] Yet, the district court ignored NML's allegations regarding SpaceX's pre-launch services and instead credited defense counsel's unsupported representations about the content of the Launch Services Contracts. ER 11-12; *see* ER 33:11, 34:2-35:2. That was improper because, at the motion-to-dismiss stage, "factual challenges to [the] plain-

---

[2] NML's additional documents demonstrated that "launch services" are employed years in advance of the launch date. *See*, *e.g.*, ER 23; ER 27-28 ¶ 6. Customers like Argentina must provide SpaceX with a host of complex data inputs—such as the satellite's construction, orbital parameters, and thermal and computer models—at least fifteen months before the launch. ER 23; ER 27-28 ¶ 6. Using this data, SpaceX will render numerous peremptory services, including testing the satellite's compatibility with its rockets, resolving technical issues, making data adjustments—or even completely redesigning the satellite. ER 23; ER 27-28 ¶ 6. These extensive preparatory steps—both technically complex and frequently plagued by trial and error, s*ee* ER 64 ¶ 32; ER 95—will take between eighteen and twenty-four months, ER 23; ER 27-28 ¶ 6.

tiff's complaint" and the defendant's factual assertions "have no bearing on the legal sufficiency of the allegations." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

Indeed, Argentina's submissions to the district court and to this Court *concede* that Argentina's satellite launches require extensive pre-launch services that Argentina necessarily uses in the months prior to launch. The declaration from CONAE's director that Argentina submitted in support of its motion to dismiss explains: "An instrumental part of the design of a satellite depends on the characteristics of the launching vehicle," and, thus, "technicians working for [the launch provider] are conducting tests and preparing [the satellite] for launch." ER 46 ¶¶ 9-10.[3] And, in this Court, Argentina stated in its opposition to NML's motion to expedite that SpaceX is currently providing pre-launch services to Argentina: "[A]s time progresses," Argentina's Launch Services Rights "become more uniquely tailored to CONAE's specific satellites." Opp'n to Mot. to Expedite 3, CA9 D.E. 13.

The district court nevertheless concluded that, "[j]ust as satellites are not put into action until they are in orbit . . . the Launch Service[s] Rights are not pressed

---

[3] This declaration was originally submitted in connection with a prior suit to attach Argentina's satellites, *NML Capital, Ltd. v. SpacePort Sys. Int'l, L.P.*, No. 11-cv-3507 (C.D. Cal.), but was again submitted in the district court as an exhibit supporting Argentina's motion to dismiss, *see* ER 42 ¶ 3.

into service until the launch process begins." ER 12. This was legal error. The district court's conclusion disregards the services Argentina is receiving before "the launch process begins." Indeed, because there can be no launch without pre-launch services, the Launch Services Rights must include the necessary pre-launch services. And NML's Complaint and Argentina's concessions certainly make "plausible," at a minimum, NML's allegations that Argentina is currently using those pre-launch services. *Iqbal*, 556 U.S. at 679.

### 2. Argentina Is Currently Using The Launch Services Rights To Secure Future Commercial Services.

a. Even apart from the ongoing services before the launches, the Launch Services Rights are currently "used for" commercial activity because Argentina is employing them now to secure commercial services in the future (namely, the September 2015 and September 2016 launches, and the associated services).

In *Af-Cap*, this Court instructed that the FSIA's provisions should be read in a "straight-forward" manner. 475 F.3d at 1091. In line with that instruction, *Af-Cap* makes clear that a sovereign is "using" property when it presently employs that property to secure future services. Although the district court characterized *Af-Cap* as foreclosing the possibility that "maintenance" of property could constitute "using" it, ER 11-12, *Af-Cap* said nothing of the sort. To the contrary, *Af-Cap* observed that using a letter of credit to secure future services constituted present commercial use. *See* 475 F.3d at 1092. In so doing, *Af-Cap* primarily relied upon

27

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989). *Af-Cap*, 475 F.3d at 1092. There, Petrobras (the sovereign) agreed to pay Atwood (a private American company) to drill oil wells, and provided a letter of credit "[a]s security for the money due Atwood." *Id.* The letter of credit was *in use* to secure future services: "Petrobras plainly used the letter of credit for a commercial purpose within the ordinary meaning of the phrase 'used for.' Petrobras used the letter of credit to secure the services of an American corporation to do drilling work." *Id.* (internal quotation marks omitted).

As this Court explained, "used" in Section 1610(a) is defined by its colloquial meaning "in conversation." *Af-Cap*, 475 F.3d at 1088 (internal quotation marks omitted). Colloquial examples illustrate that property is "used for a commercial activity" when it is employed today to secure commercial services tomorrow. A steel mill that puts a lawyer on retainer "uses" the contract to lock up the lawyer's future services. A purchaser of the option to buy 1,000 shares of a stock at $50 per share in one week is using that right today to lock in a favorable price and availability of the shares. And an airline that prepays for jet fuel when the market appears favorable similarly uses its rights under the prepayment contract to receive the fuel at a future date.

Indeed, the Supreme Court has recognized that "a contract to buy army boots or even bullets is a 'commercial' activity"; such "sales contracts" are used for

28

commercial activity even though the actual *transfer of goods* does not take place until later. *Weltover*, 504 U.S. at 614-15. There is no reason in law or logic that the rule would be different for contractual transfers of *services*. And the Fifth Circuit in *Connecticut Bank of Commerce v. Republic of Congo*—a decision this Court embraced in *Af-Cap*—noted that "used for" encompasses many "temporal" meanings: "the intended use of the property in the future," as well as "its use in the present or the past." *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 257-58 (5th Cir. 2002).

As with any other contract for future services, Argentina is using the Launch Services Rights "to secure the [commercial] services of an American corporation." *Af-Cap*, 475 F.3d at 1092 (internal quotation marks omitted). Argentina is actively employing the Rights by locking up commercial services from SpaceX—the right to launch its satellites and the right to various pre-launch services—to guarantee that SpaceX will provide those services at the appointed times. At a minimum, Argentina has purchased options to launch satellites in September 2015 and September 2016, and it is using those rights to ensure that SpaceX does not launch other satellites during Argentina's launch windows.

b. The district court disagreed that Argentina was "using" its Launch Services Rights to secure SpaceX's future performance for two reasons, neither of which remotely reflects a view of the record in the light most favorable to NML.

29

*First*, the district court recognized that "NML alleged that the Launch Service[s] Rights are or were used for commercial activity because they were acquired in a commercial transaction *and SpaceX maintains an open launch slot as a result*." ER 11 (emphasis added). This Court's precedent is clear that "the district court was obligated to accept this well-pleaded allegation as true, not to look beyond the complaint and make a factual determination based on incomplete evidence." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 664 (9th Cir. 1998); *see also* Fed. R. Civ. P. 12(d). Yet, far from accepting NML's factual allegations as true, the district court did the opposite and concluded that "the Launch Services Right[s] were not used to keep launch slots open." ER 11. That is simply not permissible at the motion-to-dismiss phase, and is particularly inappropriate in the absence of competent evidence. Argentina declined to tender its contracts with SpaceX for the court's review, ER 33:7-35:2, and the unsupported assertions of SpaceX's attorney about those contracts are not sufficient to overcome NML's well-pleaded allegations at *any* phase of the proceeding, never mind the motion-to-dismiss phase, *see Lee*, 250 F.3d 688; *see also supra* Part I.A.1.b.

*Second*, the district court also asserted that "SpaceX's conduct is nothing more than maintenance in connection with a commercial activity, which is insufficient under *Af-Cap*, 475 F.3d at 1091." ER 11-12. But, as *Af-Cap* makes clear on the very page cited by the district court, *SpaceX*'s conduct is irrelevant: "[I]t is in-

deed the *foreign sovereign*'s use of the property that is determinative," not "a private party's . . . use." *Af-Cap*, 475 F.3d at 1091 (emphasis added). This distinction is critical: While the *seller* of an option may not be using the option contract—indeed, it already has received its consideration—the *buyer* is using it to secure future goods or services. Argentina is using its Launch Services Rights in precisely this manner.

*     *     *

NML's Complaint plausibly alleged that Argentina is "us[ing]" its Launch Services Rights for commercial activity. Argentina is presently employing its Launch Services Rights to obtain necessary pre-launch services for its upcoming launches, as well as to lock up future commercial services—*i.e.*, the right to launch its satellites and the right to pre-launch services—from SpaceX. The district court's contrary conclusion that the Launch Services Rights are not "used" "until the launch process begins" implausibly suggests that Argentina's multi-year contractual relationship with SpaceX creates an attachable interest in property only for the few hours Argentina's satellite sits atop SpaceX's rocket before launch. That is not the "straight-forward" reading of "used" that this Court's cases require.

## B.    Argentina's Usage Is "Commercial Activity."

Argentina's ongoing and future use of the Launch Services Rights is "commercial activity" under Section 1610(a). Despite its mistaken ruling as to the tim-

ing of Argentina's "use" of its rights, the district court correctly recognized that Argentina was engaged in commercial activity. ER 11-12.

Private companies, acting in the regular course of their commercial operations, regularly obtain launch services from SpaceX. Argentina's use of those services is therefore "commercial activity" because it is "the *type* of actio[n] by which a private party engages in 'trade and traffic or commerce.'" *Weltover*, 504 U.S. at 614.

The FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*." 28 U.S.C. § 1603(d) (emphasis added). The statute further defines "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.*

The Supreme Court in *Weltover* explained that, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." 504 U.S. at 614. According to the Court, "because the [FSIA] provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,' the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objec-

tives." *Id.* (internal citation omitted). "Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* The Court then provided a helpful example to clarify this distinction: "[A] foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Id.* at 614-15.

Following the Supreme Court's guidance, this Court has distinguished "commercial activity" from "sovereign activity" based on whether private companies regularly engage in the foreign sovereign's conduct at issue. In *Sun v. Taiwan*, for example, this Court held that promoting and conducting cultural tours was a commercial activity. 201 F.3d 1105, 1108-09 (9th Cir. 2000). In contrast, this Court concluded in *Corzo v. Banco Central de Reserva del Peru* that granting exchange-rate compensation is *not* commercial activity because "[a] private party does not have the power to regulate currency exchange rates." 243 F.3d 519, 525 (9th Cir. 2001).

Under this standard, Argentina's use of its Launch Services Rights plainly is a commercial activity, as the district court acknowledged. *See* ER 12 (SpaceX's

conduct was "in connection with a commercial activity"). As the Complaint makes clear, SpaceX is a private, for-profit company that provides commercial satellite launch services predominantly to other private companies. ER 57, 64 ¶¶ 6, 32. Indeed, more than 60% of SpaceX's satellite launches were performed for commercial customers. ER 64 ¶ 32. In securing and continuing to use the Launch Services Rights provided by SpaceX, Argentina acted just like any private company that would like to use SpaceX's launch services. ER 64 ¶ 33. Like the contracts for army boots or bullets in *Weltover*, or the cultural tours in *Sun*, the Launch Services Rights at issue here can be—and regularly are—secured and used by private companies.

Accordingly, Argentina is using the Launch Services Rights for commercial activity, and the FSIA does not immunize them from attachment.

## II. NML May Attach Assets Held In CONAE's Name To Satisfy Judgments Entered Against Argentina.

As the district court agreed, NML may proceed against CONAE in order to satisfy judgments entered against Argentina. Argentina contended below that CONAE is "presumptively separate" from Argentina, and is "not liable for [the] state's debts." Defs.' Mot. to Dismiss 11-12, 17, D.E. 18-1 ("Mot."). But Argentina is incorrect: CONAE is not a separate "agency or instrumentality," but instead is a "political subdivision," and thus NML can attach CONAE's property to satisfy its judgments against Argentina.

34

Although agencies or instrumentalities are presumptively separate from the state, *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 624 & nn.13-14 (1983) ("*Bancec*"), "not every organ of a foreign state is an 'agency or instrumentality,'" *Garb*, 440 F.3d at 596 n.20. Instead, under this Court's precedent, the well-defined category of "agencies or instrumentalities" extends only to foreign-state entities whose core function is commercial rather than governmental. A "typical . . . instrumentality" entitled to a presumption of separateness is a government "[c]orporatio[n]," operated for commercial purposes "as a distinct economic enterprise." *Bancec*, 462 U.S. at 624 & nn.13-14. By contrast, *governmental* entities—referred to in the FSIA as "political subdivision[s]," 28 U.S.C. § 1603(a)—are inseparable from the state for all purposes, including liability. Because CONAE's core functions are governmental, it is a "political subdivision" of Argentina, indistinguishable from the state, and NML can satisfy its judgments against Argentina by attaching property nominally held by CONAE.

A.  **The "Core Functions" Test Governs Separate Legal Personhood For Purposes Of Liability And Jurisdiction Under The FSIA.**

1.  This Court has "adopt[ed] the 'core functions' test as the appropriate benchmark for deciding whether an entity should be viewed as a 'foreign state' or as" a legally distinct "'agency or instrumentality'" under the FSIA. *Cubic*, 495 F.3d at 1035. That test asks "whether the defendant is 'an integral part of a foreign state's political structure' or, by contrast, 'an entity whose structure and function is

35

predominantly commercial.'" *Id.* at 1034 (quoting *Transaero*, 30 F.3d at 151).

Only the latter is considered a "separate legal person." *Id.*; *see also Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 214-15 (4th Cir. 2011); *Garb*, 440 F.3d at 592-94; *Magness v. Russian Fed'n*, 247 F.3d 609, 613 n.7 (5th Cir. 2001); *Transaero*, 30 F.3d at 151. Argentina argued below that the "core functions" test is limited to "ministries, treasuries, or other government departments," Mot. 16, but the *test applies* to all governmental entities—not merely those found governmental *under the test*. And through its application, the "core functions" test distinguishes among "political subdivision[s]" inseparable from the state and "agenc[ies] or instrumentalit[ies]" presumed to be separate from the state. Indeed, as the Second Circuit has explained, "the very purpose of the 'core functions' test is *to look beyond mere labels* to discern whether an entity is actually engaged in predominantly governmental activity or whether its primary functions are instead commercial." *Garb*, 440 F.3d at 597 n. 22 (emphasis added). In any event, Argentina's national space agency most certainly is a "government department" as to which the "core functions" test applies—even under Argentina's cramped understanding of that test.

Although the "core functions" test sometimes has been applied to determine whether a defendant state was immune from suit, its application is not limited to that context. When there is jurisdiction over a foreign state, the same test applies

to determine whether a related entity is a political subdivision liable for the state's debts. *See Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*, 361 F.3d 676, 687-88 (2d Cir. 2004); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003).[4] The question for both jurisdictional and liability purposes is the same: whether a political subdivision is a "separate legal person" or "a part of the foreign state itself." *Cubic*, 495 F.3d at 1034-35.

Indeed, the core functions test serves numerous purposes under the FSIA. It determines which set of FSIA protections apply to an entity. *See*, *e.g.*, *Garb*, 440 F.3d at 590 (jurisdiction under 28 U.S.C. § 1605(a)(3)); *Transaero*, 30 F.3d at 151 (service of process under 28 U.S.C. § 1608); *Magness*, 247 F.3d at 613 n.7 (same);

---

[4] In *Noga*, the Second Circuit held that an arbitration award against the Government of Russia was enforceable against the Russian Federation because the "Federation and the Government are not separate 'parties.'" 361 F.3d at 690. In *Roeder*, the D.C. Circuit held that "the [Iranian] Ministry of Foreign Affairs must be treated as the state of Iran" for purposes of liability under the Flatow Amendment. 333 F.3d at 234. Other cases also apply the "core functions" test to treat political subdivisions as part of the state. In *SerVaas Inc. v. Republic of Iraq*, for example, the Second Circuit found "no meaningful legal distinction" between Iraq and its Ministry of Industry. No. 10-828-CV, 2011 WL 454501, at *3 (2d Cir. Feb. 10, 2011), *as amended* (Feb. 16, 2011). It thus held that the Ministry's purchase of and payment for certain goods and services—which formed the "[b]as[is]" of the plaintiff's action against the Ministry and the Republic—could be "imputed" to the Republic. *Id.* And, in *Wye Oak*, the Fourth Circuit held that Iraq and its Ministry of Defense "are legally one and the same." 666 F.3d at 215. It thus concluded that, "if Wye Oak's allegations would be sufficient to bring a claim against [the Ministry] . . . , those same allegations are also sufficient to bring a claim against Iraq." *Id.*

*Cubic*, 495 F.3d at 1035-36 (exception to attachment immunities under 28 U.S.C. § 1610). And the test also determines whether an entity's conduct may be attributed to a foreign state for purposes of jurisdictional immunity. *See, e.g., SerVaas*, 2011 WL 454501, at *2 ("imput[ing] the commercial activity of the Ministry [of Industry]" to the Republic of Iraq); *Wye Oak*, 666 F.3d at 215 (imputing commercial activity of Ministry of Defense to the Republic of Iraq). This latter function— attributing conduct for jurisdictional purposes—makes clear that the actions of a political subdivision can bind a foreign state. And, because a political subdivision and a foreign state are "legally one and the same," *Wye Oak*, 666 F.3d at 215, a foreign state must also be able to bind its political subdivisions.

2. Challenging this line of authority, Argentina argued below that the core functions test cannot apply to make a sub-unit of the state liable for the debts of the parent state because the Supreme Court held in *Bancec* that "the FSIA 'was not intended to affect . . . the attribution of liability among instrumentalities of a foreign state." Mot. 15-16 (quoting *Bancec*, 462 U.S. at 620). But that argument just assumes its conclusion—that the entity is an "instrumentality" and not a "political subdivision" of the state. And attribution of liability to political subdivisions of foreign states is "guided by the policies articulated by Congress in enacting the FSIA." *Bancec*, 462 U.S. at 621.

Indeed, under the FSIA, there is no meaningful difference between attributing conduct for purposes of liability and attributing conduct for jurisdictional purposes. Sovereign entities therefore appropriately are judged by the same standard for both purposes. Separate tests would create a needlessly complicated patchwork of entities with different statuses—and accountable for different conduct—in different contexts. It would, for example, authorize jurisdiction over a suit against a political subdivision of a foreign state "based upon a commercial activity" of the foreign state itself, 28 U.S.C. § 1605(a)(2), but require application of *Bancec*'s alter ego test to obtain relief against the same subdivision based on the same conduct. *See infra* Part II.A.3. This would defeat the FSIA's purpose of providing a "comprehensive set of legal standards." *NML III*, 134 S. Ct. at 2255 (quoting *Verlinden*, 461 U.S. at 488).

Yet even if the FSIA did not compel attribution of liability among a state and its political subdivisions, several considerations would compel the application of the core functions test in the liability context, as other courts of appeals have recognized:

*First*, the core functions test is consistent with the federal common law governing domestic agencies. That test "is the same standard that has been adopted by the Supreme Court in determining whether an agency or instrumentality of a state is entitled to Eleventh Amendment Immunity." *Noga*, 361 F.3d at 688 (citing *Hess*

39

*v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 50-51 (1994)).  Similarly, federal "agencies are treated as constituent parts of a unitary entity" and allowed to "set off the debts owned by one of them against the claims of the other." *Id*.  That principle extends to any "agency selected by Government to accomplish *purely Governmental purposes*."  *Cherry Cotton Mills v. United States*, 327 U.S. 536, 539 (1946) (emphasis added).  Foreign agencies deserve no greater separateness in United States courts than do domestic agencies.

*Second*, the core functions test accords with international law.  "The distinction . . . between the acts of a sovereign and the acts of one of its governmental organs . . . finds no basis in international law." *Noga*, 361 F.3d at 688-89.  Instead, "[a]n axiomatic principle of international law is that '[t]he conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State.'" *Id.* at 689 (quoting Draft Articles on Responsibilities of States for Internationally Wrongful Acts ("Draft Articles"), art. 4(1), *available at* http://legal.un.org/ilc/texts/instruments/ english/commentaries/9_6_2001.pdf) (second alteration in original).  The same result applies to any entity that "exercise[s] elements of the governmental authority."

Draft Articles, art. 4(2), 7. Attribution under international law thus turns on whether an entity's functions are governmental.

*Third*, "ease of administration in the district courts" favors a "categorical approach" based on the well-established categories that the core functions test embodies. *Transaero*, 30 F.3d at 152. The courts have "acquired expertise in delineating the categories of 'governmental' and 'commercial' under the immunity provisions of the Act," and "that expertise will benefit all concerned" in applying the core functions test in determining liability, just as with jurisdiction, by encouraging consistency, predictability, and uniformity from circuit to circuit. *Id.* at 152-53.

For each of these reasons, CONAE's status as a political subdivision must be judged under the core functions test. Because CONAE's functions are governmental, as explained *infra* Part II.B, CONAE is not distinct from Argentina, and NML may attach assets nominally held by CONAE.

3. In place of the core functions test, Argentina argues that CONAE must be presumed separate from Argentina—and cannot be held liable for Argentina's conduct—unless CONAE is Argentina's "alter ego" under the test articulated in *Bancec*. Mot. 11-12.[5] Argentina is mistaken. *Bancec*'s test does not control

---

[5] In *Bancec*, the Court held that a creditor may not seek satisfaction against a foreign state's agencies or instrumentalities unless either (a) the agency or instrumentality is "so extensively controlled by its owner [the foreign state] that a re-

*(Cont'd on next page)*

here because that test applies only to a foreign state's "agencies and instrumentalities." The *Bancec* Court made clear that the "government instrumentalities" presumed to be separate were the same "agencies or instrumentalities" whose attachment immunities were governed by 28 U.S.C. § 1610(b). *Bancec*, 462 U.S. at 626-28. *Bancec*'s presumption of separateness—and the corresponding test applicable to overcome that presumption—simply does not apply to political subdivisions. Application of that test to CONAE would put the cart before the horse, and presume that CONAE is separate, without first demonstrating that it is an agency or instrumentality that benefits from any such presumption of separateness. *See Noga*, 361 F.3d at 685 (explaining that "the *Bancec* decision is of little help to us here" because "the principal issue in this appeal is whether the Government is an instrumentality established as a juridical entity distinct and independent from the Russian Federation").

If political subdivisions were presumptively separate from the foreign state, that would undermine Congress's decision in the FSIA to allow a foreign state's judgment creditors to attach certain state property used for commercial activity in the United States. *See* 28 U.S.C. § 1610(a). "A foreign state is nothing more than

---

*(Cont'd from previous page)*

lationship of principal and agent is created," or (b) recognizing the separateness "would work fraud or injustice." 462 U.S. at 629.

the sum of its parts," and, "like the United States, . . . exists only through its head of state, its ministries, and the myriad administrative offices that collectively embody a sovereign state. More importantly, the foreign state can act"—and hold and use property—"only through these entities." *Cubic*, 495 F.3d at 1035. But, if foreign states' judgment creditors cannot satisfy their judgments against property held by the foreign state through its political subdivisions, foreign sovereigns could freely evade lawful money judgments by conducting their affairs through such subdivisions. And one fairly could expect a "uniquely recalcitrant debtor" sovereign like Argentina to jump through this loophole immediately upon its opening. *See NML II*, 727 F.3d at 247. That is not and cannot be the law.

### B. Under The Core Functions Test, CONAE Is Not A Separate Legal Person Because Its Primary Function Is Governmental, Rather Than Commercial.

Under the core functions test, CONAE is a mere political subdivision of Argentina—not a separate legal entity—and is thus subject to Argentina's waiver of immunity and liable for Argentina's debts. As the district court correctly recognized, "CONAE's functions . . . are more similar to a governmental entity's than a commercial enterprise's." ER 10. This court should affirm the district court's conclusion in this respect for at least four reasons.

*First*, CONAE's mission is governmental. CONAE is Argentina's national space agency, founded in 1991 to replace its former national space agency. ER 1

(citing ER 60 ¶ 20; ER 77). Operating a national space program is inherently a core governmental function. NASA, for example, carries out the "objectives of the United States for human expansion into space." 42 U.S.C. § 18312(b). Similarly, CONAE's enabling act provides that CONAE manages Argentina's "overall space policy," which is "of great interest for the National State." ER 60 ¶ 20 (quoting ER 77-78). The CONAE website, http://www.conae.gov.ar, has an Argentine government domain name and describes CONAE as a "specialized agency of the Argentine State" with a mission "to plan, execute and evaluate a National Space Program for peaceful use of space science and technology." CONAE, *About CONAE*, http://www.conae.gov.ar/index.php/english/component/content/article/87-conae-en/294-sobre-conae (last visited May 11, 2015). Just as waging war is a traditional government function, *see Cubic*, 495 F.3d at 1035, so too is space exploration, *see* ER 10; *see also* Andrew Liptak, io9, *The History (and Future) of Commercial Space Flight*, http://io9.com/5148420/the-history-and-future-of-commercial-space-flight (Feb. 12, 2009).

*Second*, CONAE plays an important role in Argentina's foreign affairs. CONAE is responsible for implementing at least two of Argentina's treaties—the Convention on the Registration of Objects Launched into Outer Space, and the Basic Agreement for Cooperation in Peaceful Applications of Space Science and Technology, by and between the Government of the Argentine Republic and the

44

Government of the Federative Republic of Brazil. ER 61 ¶ 22; *see also* ER 10 n.7. And "CONAE's international endeavors must conform with Argentina's foreign policy objectives, and the Ministry of Foreign Relations and Religion may intervene in any attempted international cooperation." ER 2; *see also* ER 79. CONAE's role in conducting Argentina's foreign affairs "is an important and indispensable governmental function." *Roeder*, 333 F.3d at 234-35 (internal quotation marks omitted). And such governmental foreign-affairs functions include treaty implementation. ER 10 n.7; *see also Gov't of Jamaica v. United States*, 770 F. Supp. 627, 631 (M.D. Fla. 1991).

*Third*, CONAE is one of Argentina's administrative agencies. As the district court found, CONAE's "enabling act proclaims CONAE a 'National Government agency.'" ER 1-2 (quoting ER 78). Eight of its nine Directors are direct governmental appointments—as Argentina's own evidence confirms. ER 2; ER 50-51 ¶ 4; ER 62 ¶ 24. CONAE "reports 'directly and exclusively' to Argentina's president." ER 2; *accord* ER 62 ¶ 24 (citing ER 78). As the district court found, CONAE has no financial independence but rather "relies on appropriations from Argentina's legislature and must prepare an annual budget subject to parliamentary approval." ER 2; *accord* ER 61-62 ¶ 23 (quoting ER 80). Because CONAE is not financially or politically independent, it is a part of the Argentine state—not a separate legal entity. *See Cubic*, 495 F.3d at 1036; *see also* ER 10 n.8. It is a classic

45

administrative agency, or "governmental unit beneath the central government," like a Ministry of Culture or Ministry of Treasury. *See Magness*, 247 F.3d at 613 n.7; *Garb*, 440 F.3d at 594-96.

*Fourth*, as the district court found, "there is nothing commercial about CONAE's space program." ER 10. CONAE's website lists no commercial activities. *See*, *e.g.*, CONAE, *Satellite Missions*, http://www.conae.gov.ar/index.php/english/satellite-missions (last visited May 9, 2015). Here, for example, CONAE's satellite launches are "part of an international space mission to study the global environment." ER 3; *accord* ER 42-43 ¶¶ 3-5. Accordingly, CONAE's functions cannot be said to be "predominately commercial," *see Cubic*, 495 F.3d at 1034; they are not commercial *at all*. CONAE therefore is a political subdivision of Argentina, subject to its waiver of immunity and liable for its debts.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment of dismissal, vacate the district court's order denying as moot NML's motion for leave to take discovery, and remand this case for further proceedings. Furthermore, because the value of the Launch Services Rights are depreciating with the passage of time, NML respectfully requests that the Court expedite oral argument and issue its mandate forthwith.

46

## STATEMENT OF RELATED CASES

NML is aware of no related cases pending before this Court.

Dated: May 26, 2015                                  Respectfully submitted,


HAROLD A. BARZA                                      /s/ Matthew D. McGill
BRUCE E. VAN DALSEM                                  THEODORE B. OLSON
IAN S. SHELTON                                       MATTHEW D. McGILL
QUINN EMANUEL URQUHART & SULLI-                      SCOTT P. MARTIN
VAN, LLP                                             CHRISTOPHER B. LEACH
865 South Figueroa Street, 10th Floor               GIBSON, DUNN & CRUTCHER LLP
Los Angeles, CA 90017                                1050 Connecticut Avenue, N.W.
Telephone: 213.443.3000                              Washington, DC 20036-5306
Facsimile: 213.443.3100                              Telephone: 202.955.8500
                                                     Facsimile: 202.467.0539


STEVEN A. ENGEL                                      ALEXANDER K. MIRCHEFF
DECHERT LLP                                          GIBSON, DUNN & CRUTCHER LLP
1095 Avenue of the Americas                          333 South Grand Avenue
New York, NY 10036                                   Los Angeles, CA 90071-3197
Telephone: 212.698.3500                              Telephone: 213.229.7307
Facsimile: 212.698.3599                              Facsimile: 213.229.6307


*Attorneys for Plaintiff-Appellant NML Capital, Ltd.*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that:

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,830 words, as determined by the word count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Date:  May 26, 2015                    /s/ Matthew D. McGill
                                       Matthew D. McGill
                                       GIBSON, DUNN & CRUTCHER LLP
                                       1050 Connecticut Avenue, N.W.
                                       Washington, DC  20036-5306
                                       Telephone: 202.955.8500
                                       Facsimile: 202.467.0539

                                       *Attorney for Plaintiff-Appellant NML Capital, Ltd.*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

28 U.S.C. § 1603 ........................................................................................1

28 U.S.C. § 1604 ........................................................................................1

28 U.S.C. § 1605 ........................................................................................2

28 U.S.C. § 1606 ........................................................................................5

28 U.S.C. § 1609 ........................................................................................5

28 U.S.C. § 1610 ........................................................................................6

**28 U.S.C. § 1603**

**§ 1603. Definitions**

For purposes of this chapter—

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

(c) The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

(e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

**28 U.S.C. § 1604**

**§ 1604. Immunity of a foreign state from jurisdiction**

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

1

## 28 U.S.C. § 1605

## § 1605. General exceptions to the jurisdictional immunity of a foreign state

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to--

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration

2

all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That—

(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

(c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection

(b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

(d) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

(g) LIMITATION ON DISCOVERY.—

(1) In general.—(A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

(B) A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

(2) SUNSET.—(A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would--

(i) create a serious threat of death or serious bodily injury to any person;

(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

(3) EVALUATION OF EVIDENCE.—The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

(4) BAR ON MOTIONS TO DISMISS.—A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

(5) CONSTRUCTION.—Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

## 28 U.S.C. § 1606

### § 1606. Extent of liability

As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

## 28 U.S.C. § 1609

### § 1609. Immunity from attachment and execution of property of a foreign state

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a

5

foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

## 28 U.S.C. § 1610

### § 1610. Exceptions to the immunity from attachment or execution

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

(2) the property is or was used for the commercial activity upon which the claim is based, or

(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

(4) the execution relates to a judgment establishing rights in property—

(A) which is acquired by succession or gift, or

(B) which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

(6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

(7) the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on

January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a) (2), (3), or (5) or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based, or

(3) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if--

(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

7

(e) The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

(f)(1)(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

(B) Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

(2)(A) At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

(B) In providing such assistance, the Secretaries--

(i) may provide such information to the court under seal; and

(ii) should make every effort to provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

(3) WAIVER.—The President may waive any provision of paragraph (1) in the interest of national security.

(g) PROPERTY IN CERTAIN ACTIONS.—

(1) IN GENERAL.—Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate

juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE.—Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

(3) THIRD-PARTY JOINT PROPERTY HOLDERS.—Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief for Appellant NML Capital, Ltd. with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 26, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: May 26, 2015

/s/ Matthew D. McGill
Matthew D. McGill
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorney for Plaintiff-Appellant NML Capital, Ltd.*