**15-55449**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

NML CAPITAL, LTD.,
*Plaintiff-Appellant,*

v.

SPACE EXPLORATION TECHNOLOGIES CORP., a.k.a. SPACEX;
THE REPUBLIC OF ARGENTINA, a foreign state, including its *COMISIÓN NACIONAL DE ACTIVIDADES ESPACIALES*, a.k.a. CONAE,
*Defendants-Appellees.*

---

On Appeal from the United States District Court,
Central District of California No. 2:14-cv-02262-SVW
The Honorable Stephen V. Wilson

---

**Brief of Defendant-Appellee The Republic of Argentina**

---

Donald R. Brown
Carl L. Grumer
Benjamin G. Shatz
MANATT, PHELPS & PHILLIPS, LLP
11355 W. Olympic Boulevard
Los Angeles, CA 90064-1614
(310) 312-4000 ● Fax (310) 312-4224

Matthew D. Slater
CLEARY GOTTLIEB
STEEN & HAMILTON LLP
2000 Pennsylvania Ave., NW, 9th Fl.
Washington D.C. 20006
(202) 974-1500 ● (202) 974-1999

Jonathan I. Blackman
Carmine D. Boccuzzi
Michael M. Brennan
CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000 ● (212) 225-3999

Attorneys for *Defendant-Appellee*
The Republic of Argentina

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF JURISDICTION.....................................................4

STATEMENT OF ISSUES ................................................................4

STATEMENT OF THE CASE............................................................5

    A. The Republic's Crisis, Default, and Debt Restructuring............................5

    B. Plaintiff-Appellee NML .............................................................8

    C. NML's First Rejected Creditor's Suit Against CONAE's Immune
       Property ............................................................................11

    D. The District Court Properly Dismisses NML's Second Improper
       Attempt To Execute On Immune CONAE Satellite Property ................15

SUMMARY OF THE ARGUMENT ..................................................20

STANDARD OF REVIEW ..............................................................21

ARGUMENT ................................................................................22

    POINT I: THE DISTRICT COURT CORRECTLY DISMISSED NML'S
    COMPLAINT, WHICH FAILED TO PLAUSIBLY ALLEGE THAT
    CONAE'S CONTRACT RIGHTS ARE SUBJECT TO A FSIA
    IMMUNITY EXCEPTION ..........................................................22

       A. The FSIA Renders All Foreign State Property Immune From
          Execution, Unless It Is "Used For A Commercial Activity In
          The United States" ........................................................23

       B. NML's Complaint Failed To Plausibly Allege That CONAE Is
          "Using" Its Contract Rights For A Commercial Activity..............26

          1. NML's Strained Definition Of "Used For" Is Contrary
             To Controlling Precedent And Otherwise Unsupported
             By Any Case Law ................................................... 26

          2. NML's Latest Strained Arguments Fail ................................. 29

       C. NML's Complaint Further Failed To Adequately Allege That
          Any Use Of The Contract Rights Is Commercial In Nature ..............35

    POINT II: THE COURT MAY ALSO AFFIRM BECAUSE NML
    FAILED TO ADEQUATELY ALLEGE ALTER EGO, AND THUS
    THAT CONAE IS LIABLE FOR THE REPUBLIC'S DEBTS OR
    SUBJECT TO JURISDICTION................................................40

CONCLUSION ............................................................................50

STATEMENT OF RELATED CASES ................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*,
475 F.3d 1080 (9th Cir. 2007) ...................................................... *passim*

*Alperin v. Vatican Bank*,
360 F. App'x 847 (9th Cir. 2009) ................................................. 44

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989) ..................................................................... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................... 21-22

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
501 U.S. 104 (1991) ..................................................................... 34

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
875 F.2d 1174 (5th Cir. 1989) ..................................................... 33

*Aurelius Capital Partners, LP v. Republic of Argentina*,
584 F.3d 120 (2d Cir. 2009), *cert. denied*, 559 U.S. 988 (2010)................... 9, 29, 36

*Autotech Techs. LP v. Integral Research & Dev. Corp.*,
499 F.3d 737 (7th Cir. 2007) ....................................................... 17

*Cal. Dep't of Water Res. v. Powerex Corp.*,
533 F.3d 1087 (9th Cir. 2008) ..................................................... 42, 44

*Colella v. Republic of Argentina*,
No. C 07-80084 WHA, 2007 WL 1545204 (N.D. Cal. May 29, 2007) ......... 40

*Colony Cove Props., LLC v. City of Carson*,
640 F.3d 948 (9th Cir. 2011) ....................................................... 21, 22

*Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*,
361 F.3d 676 (2d Cir. 2004)........................................................ 45-46, 47

*Conn. Bank of Commerce v. Republic of Congo*,
309 F.3d 240 (5th Cir. 2002) ....................................................... 25-26, 27, 32

**Page(s)**

*Corzo v. Banco Central de Reserva del Peru*,
243 F.3d 519 (9th Cir. 2001) ......................................................... 27-28

*Doe v. Holy See*,
557 F.3d 1066 (9th Cir. 2009) ....................................................... 22, 44

*EM Ltd. v. Republic of Argentina*,
131 F. App'x 745 (2d Cir. 2005) .................................................... 10

*EM Ltd. v. Republic of Argentina*,
389 F. App'x 38 (2d Cir. 2010) ...................................................... 11

*EM Ltd. v. Republic of Argentina*,
473 F.3d 463 (2d Cir. 2007), *cert. denied*, 552 U.S. 818 (2007)................... 9

*EM Ltd. v. Republic of Argentina*,
No. 03 Civ. 2507 (TPG), 2009 WL 2568433 (S.D.N.Y. Aug. 18, 2009)....... 11

*EM Ltd. v. Republic of Argentina*,
No. 08 Civ. 7974 (TPG), 2009 WL 3149601 (2d Cir. Sept. 30, 2009) .......... 11, 44

*European Cmty. v. RJR Nabisco, Inc.*,
No. 11-2475-cv, 2014 WL 1613878 (2d Cir. Apr. 29, 2014)........................ 49

*Exp.-Imp. Bank of the Republic of China v. Grenada*,
768 F.3d 75 (2d Cir. 2014).............................................................. 26

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) ("*Bancec*")..................................................... *passim*

*Flatow v. Islamic Republic of Iran*,
308 F.3d 1065 (9th Cir. 2002) ....................................................... 41, 44

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006).......................................................... 16, 45, 48

*H.W. Urban GmbH v. Republic of Argentina*,
No. 02 Civ. 5699 (TPG), 2003 WL 21058254 (S.D.N.Y. May 12, 2003) ..... 7

*Jacobson v. AEG Capital Corp.*,
50 F.3d 1493 (9th Cir. 1995) ......................................................... 30, 35

iii

**Page(s)**

*Kato v. Ishihara*,
360 F.3d 106 (2d Cir. 2004)............................................................. 39

*Magness v. Russian Fed'n*,
247 F.3d 609 (5th Cir. 2001) ......................................................... 48-49

*Ministry of Defense and Support for Armed Forces of the Islamic Republic
of Iran v. Cubic Defense Systems, Inc.*,
495 F.3d 1024 (9th Cir. 2007), *vacated on other grounds*, 546 U.S. 450
(2006) .......................................................................................... *passim*

*Muniz v. United Parcel Serv., Inc.*,
738 F.3d 214 (9th Cir. 2013) ....................................................... 35, 40

*NML Capital, Ltd. v. Banco Central De La República Argentina*,
652 F.3d 172 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 23 (2012).................... 9

*NML Capital, Ltd. v. Republic of Argentina*,
680 F.3d 254 (2d Cir. 2012).......................................................... 11

*NML Capital, Ltd. v. Republic of Argentina*,
727 F.3d 230 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2819 (2014)............... 10

*NML Capital, Ltd. v. Republic of Argentina*,
No. 04-00197 (CKK), 2005 U.S. Dist. LEXIS 47027 (D.D.C. Aug. 3, 2005)   9-10

*NML Capital, Ltd. v. Spaceport Sys. Int'l., L.P.*,
788 F. Supp. 2d 1111 (C.D. Cal. 2011) ("*NML I*") ....................................... *passim*

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
50 F. Supp. 3d 1328 ..................................................................... 30

*Parks Sch. of Bus., Inc. v. Symington*,
51 F.3d 1480 (9th Cir. 1995) ....................................................... 12

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd.*,
476 F.3d 140 (2d Cir. 2007) (*per curiam*) ....................................... 44, 49

*Peterson v. Islamic Republic of Iran*,
627 F.3d 1117, 1124 (9th Cir. 2010) ............................................. 23

iv

**Page(s)**

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
109 F.3d 850 (2d Cir. 1997)..................................................................... 7

*Republic of Argentina v. Weltover Inc.*,
504 U.S. 607 (1992) ...................................................................... 27, 37

*Roeder v. Islamic Republic of Iran*,
333 F.3d 228 (D.C. Cir. 2003) ..................................................... 45, 48

*Seijas v. Republic of Argentina*,
502 F. App'x 19 (2d Cir. 2012) ........................................................... 43

*Smith v. Marsh*,
194 F.3d 1045 (9th Cir. 1999) ............................................................ 30

*Sun v. Taipei Econ.*,
34 F. App'x 529 (9th Cir. 2002) ......................................................... 22

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
30 F.3d 148 (D.C. Cir. 1994) ....................................................... 45, 48

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983)............................................................................. 23

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) ............................................................ 22

*Wye Oak Techs., Inc. v. Republic of Iraq*,
666 F.3d 205 (4th Cir. 2011) .............................................................. 48

**Rules and Statutes**

28 U.S.C. § 1291 ................................................................................... 4

28 U.S.C. § 1330..................................................................................... 4

28 U.S.C. § 1605(a)(1)...................................................................... 4, 37

28 U.S.C. § 1609 ................................................................................... 24

28 U.S.C. § 1610(a) ..................................................................... *passim*

**Page(s)**

28 U.S.C. § 1611(b) ....................................................... 24

Fed. R. Civ. P. 12(b) ..................................................... 30

Restatement (Second) of Contracts § 1........................................... 35

Restatement (Second) of Contracts § 71 cmt. b............................................. 34

**Other Authorities**

Carmen M. Reinhart & Kenneth S. Rogoff, *This Time is Different: A Panoramic View of Eight Centuries of Financial Crises* (2008).................... 6

ARA Libertad (No. 20) (Arg. v. Ghana), Order of Dec. 15, 2012. (ITLOS Rep.), available at http://www.itlos.org/fileadmin/itlos/documents/cases /case_no.20/C20_Order_15_12_2012.pdf. ..................................... 10

Hans Tietmeyer, et al., Int'l Monetary Fund, *Economic and Financial Issues Facing Argentina*: *Report to the Government of Argentina and the International Monetary Fund* (2002), *available at* http://tinyurl.com/o2ykn9f. .............................................. 6-7

Human Rights, *'Vulture Funds' – UN expert on foreign debt welcomes landmark law to address profiteering* (Apr. 20, 2010), *available at* http://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=9 976................................................................... 9

NASA Science Missions, *Aquarius* (2011), *available at* http://science.nasa.gov/missions/aquarius ..................................... 3

Republic of Argentina, Annual Report (Form 18-K) (Sept. 30, 2011) ("Form 18-K"), *available at* http://tinyurl.com/ov6qpp5 ........................................ 8

Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l Law. 1189 (2009).................................................. 6

Paul Blustein, *And the Money Kept Rolling In (and Out): Wall Street, the IMF, and the Bankrupting of Argentina* 1 (2005).......................................... 6

## PRELIMINARY STATEMENT

Plaintiff-appellant NML Capital, Ltd. ("NML") appeals from the Order of the District Court for the Central District of California (Wilson, J.) entered on March 6, 2015 (the "Order"). The Order properly granted the Republic of Argentina's (the "Republic") and Space Exploration Technologies Corp.'s ("SpaceX") motions to dismiss, under Rule 12(b)(6), NML's creditor's suit complaint (the "Complaint"). As the district court correctly reasoned, NML failed to state a claim to execute on contractual rights of the Republic's space agency, Comisión Nacional de Actividades Espaciales ("CONAE"), to SpaceX's launch services in connection with two upcoming governmental satellite launches.

The district court correctly held that even assuming CONAE were liable for the Republic's debts, which it is not, the Complaint failed to state a claim because NML did not adequately allege that CONAE's contractual rights are subject to an exception to the broad immunity afforded to foreign state property under Section 1610(a) of the Foreign Sovereign Immunities Act ("FSIA"). As the district court ruled, NML failed to sufficiently allege that the targeted property was being "used for" any activity at all, let alone "used for a commercial activity in the United States," as Section 1610(a) requires before an exception to execution immunity can apply.

This ruling should not have come as a surprise to NML. The Order's entry marked the *second* time in less than four years that the district court rejected an improper attempt by NML to seize immune CONAE satellite property. *See NML Capital, Ltd. v. Spaceport Sys. Int'l., L.P.*, 788 F. Supp. 2d 1111, 1127 (C.D. Cal. 2011) ("*NML I*") (denying motion to execute on satellite jointly launched by CONAE, NASA, and other nations' space agencies in mission to measure ocean salinity levels to prevent drought). CONAE's satellites are not "used" on the ground, in the United States or any other country, but in space; and that "use" is not at all commercial in nature, but rather consists of gathering scientific data on climate change and other related environmental matters for the benefit of all nations and their people. In the FSIA, Congress excepted from the otherwise absolute immunity afforded to foreign state property *only* property that is affirmatively "*used* for a *commercial* activity" in the United States. Congress thus clearly intended to leave undisturbed property not being "used" at all as well as property "used for" governmental activities – such as a satellite launch to promote intergovernmental, scientific research, the results of which will be distributed at no cost to the scientific community at large.

The first time around, in *NML I*, NML sought to execute on CONAE's satellites themselves. The district court correctly denied that effort as plainly violative of the FSIA and this Court's precedent applying it, rejecting NML's

repeated, strained attempts to recharacterize CONAE's satellites that would be used only in space as somehow being "used for" a "commercial" activity in the United States. The court further denied the equitable restraint that NML sought on the basis that such interference with a benevolent scientific mission was contrary to the public interest. The satellite thus launched as scheduled, and has since contributed immensely to the global scientific community, having already collected more data about the salinity levels of the earth's oceans than had been gathered over the last 125 years, including from previously unexplored areas. *See* NASA Science Missions, *Aquarius* (2011), *available at http://science.nasa.gov /missions/aquarius/.*

NML chose not to appeal from that decision, which denied its request on multiple grounds. Instead, in March 2014, NML returned to the district court to try to interfere with additional CONAE satellite launches. Faced with the holding in *NML I* that neither CONAE satellites nor their component parts are attachable, NML presented below yet another strained immunity theory – that CONAE's ownership of contract rights to receive launch services from SpaceX in connection with the upcoming satellite launches constitutes a commercial "use" of those rights. The district court was right to note that its rejection of this unsupported, counterintuitive theory was not a close call. As the district court observed, NML's wordplay in seeking to characterize CONAE's ownership of contract rights as an

affirmative "use" of those rights, rather than comporting with the plain meaning of the statute, requires "lexicographical distension of an everyday word," Order at 12 (ER-12),[1] in direct contravention of this Court's instruction that the FSIA, including Section 1610(a)'s "used for" requirement, be applied only in a straightforward, commonsense manner.

The Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1330 and 1605(a)(1), because the Republic is a foreign state. The district court erroneously concluded that it had jurisdiction over CONAE based on its finding that CONAE is a political subdivision of the Republic, and therefore that the Republic's waiver of jurisdictional immunity extends to CONAE. *See* Order at 6-8 (ER-6-8). CONAE, however, is a separate sovereign entity and is thus immune from U.S. court jurisdiction absent an alter ego showing, *see infra* Point II.

This Court has appellate jurisdiction over this appeal under 28 U.S.C. § 1291 because the Order dismissed NML's action on March 6, 2015.

## STATEMENT OF ISSUES

1.      Under the FSIA, foreign state property is immune from execution, unless it is, *inter alia*, being "used for a commercial activity in the

---

[1] "ER" cites refer to Appellant's Excerpts of Record, filed May 26, 2015.

United States." 28 U.S.C. § 1610(a). Did the district court properly hold that the ownership of contract rights to receive services does not constitute an affirmative "use" of such rights that would subject them to execution?

      2.    Even if, contrary to the Court's precedent, the ownership of contract rights could be considered "use" under the FSIA, would such rights to receive services in connection with an indisputably sovereign, intergovernmental space mission to monitor the global climate still be immune because the use of those rights is not "commercial" in nature?

      3.    Did NML's failure to plead any facts to support the conclusion that CONAE is the alter ego of the Republic render NML's claim that CONAE is liable for the Republic's debts deficient as a matter of law, thereby providing an alternative ground for the Court to uphold the dismissal of the action?

## STATEMENT OF THE CASE

### A.    The Republic's Crisis, Default, and Debt Restructuring

      Between 1998 and 2002, the Republic experienced the worst economic and social crisis of its modern history, marked by an enduring recession, record levels of poverty and unemployment, and lack of access to the international capital markets. *See* Decl. of Noemi C. LaGreca ¶¶ 4-13, *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507 (TPG) (S.D.N.Y. June 11, 2003); Decl. of Federico Carlos Molina ¶ 3, *NML Capital, Ltd. v. Republic of Argentina*, No. 03 Civ. 8845

(TPG) (S.D.N.Y. Mar. 24, 2005); *see also* Paul Blustein, *And the Money Kept Rolling In (and Out): Wall Street, the IMF, and the Bankrupting of Argentina* 1 (2005) (describing collapse of the Argentine economy in 2001 as "one of the most spectacular in modern history"). With its economy in ruins, the country suffered social and political turmoil: riots in the streets of Buenos Aires left dozens dead and four presidents resigned within a two-week period.[2] *See* Blustein, *supra*, at 1.

By the end of 2001, the crisis made it impossible for the Republic to service its overwhelming debt burden – more than $80 billion – while maintaining basic governmental services necessary for the health, welfare, and safety of the Argentine populace. "[U]nable to service its debts," the Republic had no choice but to defer interest and principal payments to its bondholders. *See* Hans Tietmeyer *et al.*, Int'l Monetary Fund, *Economic and Financial Issues Facing*

---

[2] The Argentine crisis has been described as the "worst-case scenario" in eight centuries of financial crises. *See* Carmen M. Reinhart & Kenneth S. Rogoff, *This Time is Different: A Panoramic View of Eight Centuries of Financial Crises*, 51 (2008); *see also* Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l Law. 1189, 1196 (2009) ("The living standards of over one-half of the Argentine people fell below the poverty line, and over a third could not afford basic food. Children were fainting in class from hunger, regularly. Adults were rioting and breaking into supermarkets, regularly, in search of food. UNICEF Argentina was concerned that stunted growth and reduced mental capacities would be the long-term consequence of this economic crisis for millions of the nation's children." (internal citations omitted)).

*Argentina*: *Report to the Government of Argentina and the International Monetary Fund* ¶ 1 (2002), *available* at http://tinyurl.com/o2ykn9f.

Because there is no bankruptcy regime for insolvent states, the Republic restructured its external debt on an entirely voluntary basis.[3] The Republic did not repudiate that debt. Instead, consistent with United States policy favoring the orderly and consensual restructuring of sovereign debt, the Republic restructured its unsustainable debt burden through two global exchange offers in 2005 and 2010, in which participating holders exchanged old, nonperforming bond interests for new, performing bond interests with lower interest rates, reduced principal, and/or longer maturities. The exchange offers were extended to all beneficial owners of eligible bonds – including NML – on the same terms, and reflected the Republic's commitment to treat its private creditors equitably.

In total, in the largest sovereign debt restructuring in history at the time, the Republic exchanged approximately 92% of its nonperforming debt in

---

[3] The United States, the international financial community, and the federal courts have all recognized the importance of voluntary sovereign debt restructuring. *See, e.g.*, United States *Amicus* Brief, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105-cv(L), 2012 WL 1150791, at *6-10 (2d Cir. Apr. 4, 2012); *H.W. Urban GmbH v. Republic of Argentina*, No. 02 Civ. 5699 (TPG), 2003 WL 21058254, at *2 (S.D.N.Y. May 12, 2003) ("[A]n important channel for attempting to resolve the Argentine debt problem will undoubtedly be the effort to negotiate a debt restructuring plan."); *cf. Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 855 (2d Cir. 1997) ("[T]he United States encourages participation in, and advocates the success of, IMF foreign debt resolution procedures . . . .").

transactions completed in 2005 and 2010,[4] a percentage widely recognized,

including by plaintiff's advocates, as indicative of a successful restructuring.  *See*

Br. of *Amicus* Prof. Hal S. Scott in Supp. of Pls.-Appellees at 11, *NML Capital,*

*Ltd. v. Republic of Argentina*, No. 10-1487-cv(L) (2d Cir. July 6, 2010), ECF No.

172 (exchange offers that "garner acceptance by over 90%" are "fair"); Form 18-K

at 17.  Plaintiff-Appellant NML declined to participate in either exchange offer.

### B.　　Plaintiff-Appellant NML

　　　　　NML is a Cayman Islands hedge fund, established exclusively to buy

distressed Republic debt, that acquired beneficial interests in Republic bonds at a

deep discount both immediately before, and well after, the Republic suspended

payments on its unsustainable external debt in December 2001.  NML and similar

"vulture" hedge funds seek to take advantage of the absence of bankruptcy

protection in the sovereign context by bringing lawsuits for the face value of

defaulted sovereign debt, obtaining judgments on which interest continues to run

indefinitely, and then using aggressive means to try to execute their judgments,

---

[4] *See* Republic of Argentina, Annual Report (Form 18-K) 16 (Sept. 30, 2011)
("Form 18-K"), *available at*  http://tinyurl.com/ov6qpp5.

notwithstanding that, as they know, the FSIA renders all sovereign property

immune from attachment and execution, subject to a few, narrow exceptions.[5]

NML has used these aggressive tactics against the Republic while at

the same time continuing to speculate in nonperforming Republic debt, filing a

new complaint against the Republic as recently as November 2014 on nearly $2.7

million of defaulted Republic bond interests.  *See* Compl., *NML Capital, Ltd. v.*

*Republic of Argentina*, No. 14 Civ. 8988 (TPG) (S.D.N.Y. Nov. 12, 2014).  NML's

enforcement tactics include a series of execution attempts against property of the

Republic and other entities that the federal courts have in most cases rejected as

violating the FSIA,[6] and an attempt in March 2005 to disrupt the settlement of the

---

[5] *See, e.g.*, Press Release, Office of the High Comm'r for Human Rights, *'Vulture Funds' – UN expert on foreign debt welcomes landmark law to address profiteering* (Apr. 20, 2010), *available at* http://tinyurl.com/nwbllhy ("[T]he profiteering of 'vulture funds' [has been] at the expense of both the citizens of distressed debtor countries and the taxpayers of countries that have supported international debt relief efforts . . . . 'Vulture funds' have exploited the voluntary nature of international debt relief schemes by acquiring defaulted sovereign debt at deeply discounted prices and then seeking repayment of the full value of the debt through litigation, seizure of assets or political pressure.").

[6] *See, e.g.*, *NML Capital, Ltd. v. Banco Central De La República Argentina*, 652 F.3d 172, 196-97 (2d Cir. 2011) (rejecting NML's attempt to attach property of the Central Bank of Argentina), *cert. denied*, 133 S. Ct. 23 (2012); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 126, 130-31 (2d Cir. 2009) (rejecting attempt by NML to execute upon Argentine social security funds), *cert. denied*, 559 U.S. 988 (2010); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 465-66 (2d Cir. 2007) (rejecting other attempt by NML to attach property of the Central Bank of Argentina), *cert. denied*, 552 U.S. 818 (2007); *NML Capital, Ltd. v.*

(continued . . .)

Republic's global exchange offer by attaching – on an *ex parte* basis – the nonperforming bonds tendered into that exchange by their beneficial owners. *See EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005) (affirming vacatur of attachment). NML has gone so far as to try, unsuccessfully, to seize an Argentine naval training vessel in Ghana, in contravention of international law.[7]

Thwarted for the most part by sovereign immunity in its direct execution efforts, NML, along with other creditors, also sought to coerce the Republic into paying them by enjoining the Republic from making any payments on its restructured debt, unless and until it pays 100% of their defaulted debt, based on an unprecedented reading of the so-called *pari passu* clause in plaintiffs' debt instruments. *See NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2819 (2014). As a result, for over a year, innocent third-party holders of exchange bonds have been unable to receive interest payments made by the Republic on those bonds.

NML's assertion that the Republic has "spirited its assets outside the United States and elaborately structured its financial affairs" in order to frustrate

---

*Republic of Argentina*, No. 04-00197 (CKK), 2005 U.S. Dist. LEXIS 47027 (D.D.C. Aug. 3, 2005) (vacating NML's *ex parte* attachments of diplomatic and military property in Washington, D.C. and Maryland).

[7] *"ARA Libertad (No. 20)" (Arg. v. Ghana)*, Order of Dec. 15, 2012. (ITLOS Rep.), *available at* http://tinyurl.com/pp7swct.

NML's efforts to enforce its judgments is both inaccurate and irrelevant.  *See* NML Br. at 10-11.  The trust referenced by NML that was at issue in *EM Ltd. v. Republic of Argentina*, 389 F. App'x 38 (2d Cir. 2010), was created in 1999 – well *before* the Republic defaulted in 2001 – and therefore clearly was not part of any effort to "shield" funds from Republic creditors.  *See EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507 (TPG), 2009 WL 2568433, at *2 (S.D.N.Y. Aug. 18, 2009).  Nor were the funds at issue in *NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254 (2d Cir. 2012), part of any "subterfuge."  There, the Republic did not even "dispute that [the entity in whose name the funds were being held was] part of the Republic," and thus that they would be subject to execution in the event an exception to FSIA immunity applied.  *EM Ltd. v. Republic of Argentina*, No. 08 Civ. 7974 (TPG), 2009 WL 3149601, at *6 (S.D.N.Y. Sept. 30, 2009).

### C.    NML's First Rejected Creditor's Suit Against CONAE's Immune Property

CONAE was established "in 1991 through a presidential decree." *NML I*, 788 F. Supp. 2d at 1115.  As Argentina's space agency, CONAE is "obligated 'to undertake, design, execute, control, manage and administer space projects and undertakings . . . for peaceful purposes.'"  *Id.*  (internal citation omitted).  The relevant presidential decree, appended to the Complaint as Exhibit

C,[8] makes clear that CONAE was established as an autarkic – *i.e.*, self-sufficient – legal entity, separate from Argentina, that has "full management and financial independence." *See* Compl. Ex. C at Art. 1 (ER-78).

As an entity legally separate from the Republic, CONAE is controlled by a Board of Directors and has the power to issue its own internal regulations, establish its own structure, enter into its own agreements with private and public entities, engage in its own acts of trade, and perform all the legal acts necessary for its normal operation. *See id.* at Art. 4 (ER-79). CONAE is also charged with the duty to obtain for itself "the financial resources necessary for performance of its activities." *Id.* at Art. 3 (ER79). Thus, any request to the Republic for funds must include, for example, CONAE's "[i]ncome from the economic and commercial exploitation of patents, license, consulting, [and] providing of services." *Id.* at Art. 6 (ER-80). Contrary to NML's assertion, NML Br. at 12, it is thus clear that CONAE is an independent entity and not under the direct control of the Republic.

Just as it did below, NML fails to mention the district court's rejection in 2011 of a similar creditor's suit brought by NML against CONAE satellite property. *NML I*, 788 F. Supp. 2d 1111. In that suit, which NML coupled with a

---

[8] "When a plaintiff has attached various exhibits to the complaint, those exhibits may be considered in determining whether dismissal [i]s proper." *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (internal citation omitted).

TRO application, NML sought to interfere with the launch by third-party

Spaceport Systems International of a satellite mission involving CONAE, NASA,

and the space agencies of France, Italy, and Canada. *See id.* at 1116. By its

attachment suit and TRO application, NML tried to seize the satellite and disrupt

its launch, notwithstanding that the satellite clearly was not being "used" in the

United States, and that any future "use" would not be "commercial." *See*

Statement of Interest of the United States of America at 1, *NML I*, No. 11 Civ.

3507 (C.D. Cal. May 3, 2011), ECF No. 33 (NML's effort not only targeted

"property [that] is immune from attachment under the [FSIA]," but "would

severely disrupt the [satellite] mission for all parties, frustrate NASA's substantial

investment in the program, and severely disserve the public interest").

   The satellite launch at issue in *NML I* was, in keeping with CONAE's

status as a national space agency, "a scientific and humanitarian mission, whereby

data on the earth's ocean [would] be collected from space and [would] be

disseminated for free to the scientific community." *NML I*, 788 F. Supp. 2d at

1123-24. The goals of the mission, which sought to gather and analyze data on the

oceans' salinity levels, were to "'[m]onitor [ ] natural disasters, fires, volcanic

events, agriculture, land use, and other environmental variables' and to learn '[t]he

relationship between regional soil moisture and essential climate variables . . . on

the appearance and spread of diseases.'" *Id.* at 1116 (internal citation omitted).

The district court in *NML I* correctly denied NML's effort as violative of FSIA Section 1610(a), rejecting NML's numerous strained arguments and its shifting definition of the "property" it was targeting. *Id.* at 1121 ("Sensing that its argument was lacking, [NML] recharacterizes the property to be attached as a 'spacecraft bus' instead of the entire . . . Satellite. . . . [NML] also redefines the commercial activity at issue. . . . [NML's] last-ditch attempts are of no avail.").[9] At bottom, because no CONAE property, however characterized, could be said to be "used for" a commercial activity in the United States, NML's claims failed:

*First*, the district court in *NML I* properly applied this Court's "narrow construction" of Section 1610(a)'s "used for" requirement and held that execution was barred because any "use" of the property would take place not in the United States, but in space. *Id.* at 1120-22 (citing *Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1087 (9th Cir. 2007)).

*Second*, the Court held that execution was improper in any event because CONAE's "conduct[, which] encompasse[d] both pre-launch activities, like testing and preparation, and post-launch activities, mainly the gathering of information from space" did not qualify as "commercial" in nature, as CONAE's

_____

[9] In denying NML's TRO application, the district court in *NML I* "assume[d] . . . that 'CONAE *is* Argentina,'" but "decline[d] to rule expressly that [NML] ha[d] overcome 'the presumption of independent and separate legal status' afforded to entities like CONAE in the Ninth Circuit." *NML I*, 788 F. Supp. 2d at 1118.

"cooperat[ion] with nation-states to advance human understanding of the earth's ocean salinity" was instead "sovereign" in nature. *Id*. at 1122, 1124. Consistent with this latter ruling, NML did not allege in its most recent Complaint – nor could it – that the satellite mission at issue is itself commercial in nature. *See* Decl. of Conrado F. Varotto ¶¶ 3-5, *NML I*, No. 11 Civ. 3507 (C.D. Cal. May 15, 2014) ("Varotto Decl.") (ER-42-43) (describing the intergovernmental mission to generate scientific data, which CONAE will distribute at no cost, for application in the agricultural sector and for the prevention of loss of life and property in the event of natural disasters).

The district court in *NML I* also rejected NML's request for injunctive relief as against the public interest, holding that "the public interest in enforcing judgments" was outweighed in this context by:

> [O]ther public interests, such as: (1) the advancement of the general welfare and security of the nation through aeronautical and space activities; (2) the expansion of human knowledge of the earth; and (3) promoting cooperation between the United States and other nations in the peaceful exploration of '[s]pace: the final frontier.'

*Id.* at 1126 (internal citation omitted).

### D. The District Court Properly Dismisses NML's Second Improper Attempt To Execute On Immune CONAE Satellite Property

Notwithstanding the district court's unequivocal rejection, on numerous grounds, of NML's prior attempt to seize a CONAE satellite and disrupt

its launch, NML, on March 25, 2014, filed another creditor's suit against a third-party satellite-launching company – SpaceX – seeking to execute on CONAE's property and disrupt yet more launches of CONAE satellites. Compl. ¶ 3 (ER-56). Like NML's previous complaint, the new Complaint alleged in conclusory fashion that "CONAE is part of the Argentine state, such that a judgment against Argentina is a judgment against CONAE." *Id.* ¶ 17 (ER-59); *see also id.* ¶¶ 18-36 (ER-60-65). NML alleged that CONAE should be treated as the Republic itself because it is a "political subdivision" of the Republic rather than a separate "agency or instrumentality." *Id.* ¶ 18 (ER-60). As support for this theory, NML cited in its Complaint an inapposite line of cases, including the Second Circuit's decision in *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006), extending foreign-state immunity or procedural protections to cover certain government ministries or departments because their "core functions" were governmental rather than commercial. *Id*. ¶ 18 (ER-60).

The Complaint further asserted the legal conclusion that the satellite property at issue is being "used for a commercial activity in the United States." *Id.* ¶ 34 (ER-64-65); *see also id.* ¶¶ 27-33 (ER-63-64). Because *NML I* forecloses any action against CONAE satellites themselves, NML in its Complaint instead purported to target "CONAE's valuable rights" under its contracts with SpaceX to receive launch services in connection with upcoming launches of two CONAE

16

satellites. *Id.* ¶ 29 (ER-63).[10]  That is, notwithstanding that the physical satellites are immune from execution because they are not "used for" a commercial activity in the United States, NML alleged that it could nonetheless execute on CONAE's purported derivative contract rights to launch them.  In particular, NML asserted in its Complaint the erroneous conclusion that CONAE's contract rights are "used for" a commercial activity in the United States because "the nature of the Launch Services Contracts is commercial" and CONAE "acquired" and "maintains" those rights "in connection with those contracts."  *Id.* ¶ 33 (ER-64).

The Republic and SpaceX moved to dismiss the Complaint on May 15, 2014, arguing that the Complaint failed to plausibly allege both that (i) the targeted property falls under an exception to FSIA immunity, and (ii) CONAE is liable for the Republic's debts or subject to jurisdiction in the United States.  On March 6, 2015, the district court correctly rejected NML's latest FSIA theories and dismissed the action, finding that CONAE's mere ownership of its contract rights does not constitute "use" of those rights, and that they are therefore immune.  *See*

---

[10] The Complaint was also broadly directed at "any [p]roperty" that CONAE "acquired or maintains in connection with those contracts."  Compl. ¶ 33 (ER-64). But such unsupported, vague allegations about unidentified property fail as a matter of law.  NML bears the burden of demonstrating that an exception to FSIA immunity applies to specific identified property.  *See Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("[I]n order to determine whether immunity from execution or attachment has been waived, the plaintiff must identify specific property upon which it is trying to act . . . .  A court cannot give a party a blank check when a foreign sovereign is involved.").

Order at 10-12 (ER-10-12). The district court found unavailing NML's argument that the rights were being "used for" commercial activity because they were acquired in a commercial transaction, noting, as it did in *NML I*, that this Court has made clear that "[w]hat matters under the statute is what the property is 'used for,' not how it was generated or produced." *Id.* at 11 (ER-11) (*quoting Af-Cap*, 475 F.3d at 1080, 1087).

The district court also rejected NML's argument that the rights were being "used for" keeping SpaceX's launch slots open, finding that such conduct "is nothing more than maintenance in connection with a commercial activity, which is insufficient under *Af-Cap*, 475 F.3d at 1091." *Id.* at 11-12 (ER-11-12). The court reasoned that "to fit SpaceX's conduct within the definition of 'use' [would require] lexicographical distension of an everyday word." *Id.* at 12 (ER-12).

These conclusions required the dismissal of NML's action. However, before reaching that issue, which itself should dispose of this appeal, the district court ruled, erroneously, that it had jurisdiction over CONAE. In so holding, the district court incorrectly applied the "core functions" test to determine that "CONAE's functions are more similar to a governmental entity than a commercial enterprise's" and therefore that, as a political subdivision of the Republic, the Republic's jurisdictional waiver speaks for CONAE. *Id.* at 10 (ER-10). CONAE fits squarely within the definition of an "agency or instrumentality" of a foreign

18

state, and so is entitled to its own presumption of immunity, meaning the Republic's waiver of its own immunity does not extend to CONAE.

Although the district court was wrong to find that it had jurisdiction over CONAE based on its application of the "core functions" test, the district court did properly determine that the "core functions" test has no application to determining substantive liability. *Id.* at 8 n.5 (ER-8). The district court properly found that the correct inquiry in determining whether a distinct juridical entity can be held liable as a matter of substantive liability law is governed by the decision of the United States Supreme Court in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), which asks whether that entity is an "alter ego" of the foreign state. *Id.* (*citing Wye Oak Techs., Inc. v. Republic of Iraq*, 666 F.3d 205, 213 n.9 (4th Cir. 2011)). Having so concluded, the district court erred in not recognizing that NML's failure to include in the Complaint any allegations raising a plausible inference of alter ego provided yet another basis for dismissing this action, because without the existence of such alter ego liability, NML – a judgment creditor of the Republic – can never succeed on a creditor's suit against CONAE's property.

## SUMMARY OF THE ARGUMENT

The district court correctly dismissed NML's Complaint seeking to interfere, for the second time, with CONAE's intergovernmental, humanitarian satellite missions to gather and distribute scientific data.

*First*, NML failed to allege – as it must to establish an exception to FSIA immunity – that the targeted contract rights are being "used for" any activity in the United States, much less a commercial activity. In its Complaint, NML alleged only that the rights were acquired and are maintained "in connection with" a commercial activity. Compl. ¶ 33. That allegation is plainly insufficient to constitute "use" under FSIA Section 1610(a) pursuant to this Court's decision in *Af-Cap*, which alone warrants affirmance. *Af-Cap*, 475 F.3d at 1091 (property is "used for commercial activity" only "when [it] is put into action, put into service, availed or employed *for* a commercial activity, not *in connection* with a commercial activity" (emphasis in original)).

*Second*, even if NML had adequately pled that CONAE is "using" its contract rights, that property would still be immune under the FSIA because NML failed to sufficiently allege that any such "use" would be "commercial" in nature. As NML cannot contest, and as the Complaint did not and could not plead, the CONAE satellites at issue here are *not* commercial in nature because they are part of a governmental space mission. *E.g., NML I*, 788 F. Supp. 2d at 1125 n.5

20

(CONAE's satellite "may not be subject to execution [] because '[t]he alleged conduct itself – giving away [information] – is not a commercial activity'" (internal citation omitted)).  Any "use" of the derivative contract rights in connection with those governmental, noncommercial satellites necessarily thus cannot be commercial.

  *Third*, the Court may also affirm the dismissal of NML's Complaint because NML failed to adequately allege that CONAE is liable for the Republic's debts or subject to jurisdiction.  Under controlling Supreme Court precedent, to establish liability and jurisdiction NML was required – but failed – to plead that CONAE's separate legal status should be disregarded on an alter ego theory.  *See Bancec*, 462 U.S. at 624.  NML's insistence that the so-called "core functions" test should apply in the liability context or to entities like CONAE in the jurisdictional context runs contrary to this precedent and its progeny, and is otherwise unsupported by law or logic.

## STANDARD OF REVIEW

  This Court reviews *de novo* a district court's decision to dismiss a complaint for failure to state a claim under Rule 12(b)(6).  *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

A complaint that offers mere "labels and conclusions" or "a formulaic recitation of

the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (internal

citation omitted). While factual allegations must be accepted as true, legal

conclusions must be rejected, even if "cast in the form of factual allegations." *Doe

v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (internal citation omitted).

This Court reviews *de novo* a district court's finding that it has subject

matter jurisdiction under Rule 12(b)(1). *Colony Cove*, 640 F.3d at 955. The

district court's findings of fact on that issue should be reviewed for clear error.

*Sun v. Taipei Econ.*, 34 F. App'x 529, 530 (9th Cir. 2002). This Court may "look

beyond the complaint and consider extrinsic evidence" in assessing subject matter

jurisdiction. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th

Cir. 2003).

## ARGUMENT

## POINT I

## THE DISTRICT COURT CORRECTLY DISMISSED NML'S COMPLAINT, WHICH FAILED TO PLAUSIBLY ALLEGE THAT CONAE'S CONTRACT RIGHTS ARE SUBJECT TO A FSIA IMMUNITY EXCEPTION

The Court should affirm the Order dismissing NML's judgment

enforcement action (even if CONAE were liable for the Republic's debts, which it is

not, *see* Point II). As the district court correctly held, the contract rights targeted by

22

NML are immune from execution under FSIA Section 1610(a) because NML's

Complaint failed to sufficiently allege that CONAE is "using" them for any activity.

*See* Order at 10-12 (ER-10-12). The Court may also affirm the Order on the

separate ground that even if NML had adequately pled "use" of the contract rights,

the property would still be immune because NML did not, because it could not,

sufficiently plead that any such use would be "commercial" in nature.

### A. The FSIA Renders All Foreign State Property Immune From Execution, Unless It Is "Used For A Commercial Activity In The United States"

The FSIA "provides the sole basis for obtaining jurisdiction over" and

enforcing a judgment against "a foreign state in federal court." *Argentine Republic*

*v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989); *see also Verlinden*

*B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493, 496 (1983) ("The statute must be

applied by the District Court[] in *every* action against a foreign sovereign" and

"[a]s the House Report clearly indicates, the primary purpose of the Act was to

'se[t] forth *comprehensive* rules governing sovereign immunity'" (citing H.R. Rep.

No. 94-1487 at 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6616) (emphasis

added)). As this Court explained in *Peterson*, the FSIA provides two distinct types

of immunity: jurisdictional immunity and execution immunity. *Peterson v.*

*Islamic Republic of Iran*, 627 F.3d 1117, 1124 (9th Cir. 2010). Section 1604 of the

FSIA "establishes the general rule that 'a foreign state shall be immune from the

jurisdiction of the courts of the United States,'" and Sections 1605-1605A carve

out the exceptions to that jurisdictional immunity.  *Id*.

Section 1609 in turn states that, even when a sovereign is *not* immune

from jurisdiction in U.S. courts, all "property in the United States of a foreign state

shall be immune from attachment[,] arrest and execution except as provided" in

Sections 1610 and 1611.  *See* 28 U.S.C. § 1609.  Section 1610 provides that a

foreign state's property may be attached or executed upon only if it is both located,

and used for a commercial activity, in the United States, *and* the sovereign has also

waived its enforcement immunity, 28 U.S.C. § 1610(a)(1), or another listed

exception applies.  Section 1611 further protects uniquely sovereign assets:

military and central bank property.  28 U.S.C. § 1611(b).  Foreign state property

located in the United States is thus immune from execution in U.S. courts, unless it

is being "used" by the foreign state for a commercial activity in the United States.

*Af-Cap*, 475 F.3d at 1084 ("Because these obligations were not 'used for a

commercial activity in the United States,' they are protected from execution or

collection under the [FSIA] codified at 28 U.S.C. § 1610(a).").

In light of the fact that immunity is the rule, rather than the exception,

the plaintiff bears the burden of establishing that the foreign state property at issue

is not immune under the FSIA.  *NML I*, 788 F. Supp. 2d at 1119-20.  ("In applying

the burden-shifting framework, a district court must heed the Ninth Circuit's

instruction that 'the exceptions to immunity from execution are more narrow than the exceptions to immunity from suit' . . . . because 'Congress fully intended to create rights without remedies, aware that plaintiffs would often have to rely on foreign states to voluntarily comply with U.S. court judgments.'" (quoting *Peterson*, 627 F.3d at 1128)); *see also id.* at 1120 ("[C]ourts [must] proceed carefully in enforcement actions against foreign states."); *Af-Cap*, 475 F.3d at 1088 ("§1610(a) [the execution immunity provision] is a narrower exception" to sovereign immunity than that conferred by Section 1605, the jurisdictional immunity section "by operation of the phrase 'used for'").

Consistent with the text, structure, and history of the FSIA, this Court has interpreted the phrase "used for" in Section 1610(a) narrowly.  As the Court held in *Af-Cap*, property is "used for commercial activity" only "when the property in question is put into action, put into service, availed or employed *for* a commercial activity, not *in connection* with a commercial activity or *in relation* to a commercial activity."  *Af-Cap*, 475 F.3d at 1087, 1091 (emphasis in original). This strict application of the statute is consistent with the other appellate courts to have addressed the issue.  *See Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 254 (5th Cir. 2002) ("The phrase 'used for' . . . is not a mere syntactical infelicity that permits courts to look beyond the 'use' of property, and instead try to find any kind of nexus or connection to a commercial activity in the United States.

. . . That the property is revenue from or otherwise generated by commercial activity in the United States does not thereby render the property amenable to execution."); *Exp.-Imp. Bank of the Republic of China v. Grenada*, 768 F.3d 75, 90 (2d Cir. 2014) (adopting the "used for" standard set forth in *Conn. Bank* and *Af-Cap*: "the word 'used,' read literally . . . require[s] not merely that the property at issue relate to commercial activity in the United States, but that the sovereign actively *utilize* that property in service of that commercial activity").

## B. NML's Complaint Failed To Plausibly Allege That CONAE Is "Using" Its Contract Rights For A Commercial Activity

### 1. *NML's Strained Definition Of "Used For" Is Contrary To Controlling Precedent And Otherwise Unsupported By Any Case Law*

Applying this Court's instruction that, "[i]n this circuit, the phrase 'used for' is interpreted narrowly," Order at 11 (ER-11) (quoting *Af-Cap*, 485 F.3d at 1091), the district court properly recognized that, even if NML could establish that CONAE should be equated with the Republic, NML's Complaint must be dismissed because it was devoid of any plausible allegation that CONAE is now "using" its contract rights for a commercial activity in the United States. The *sole* assertion in the Complaint pertaining to such "use" states in its entirety:

> Because the nature of the Launch Services Contracts is commercial, any Property of Argentina in the United States that it *acquired* or *maintains* in connection with those contracts is used for a commercial activity in the United States.

26

Compl. ¶ 33 (ER-64) (emphasis added). As the district court correctly held, that

allegation of "acquisition and maintenance" of property is "insufficient" to establish

the "use" of that property under this Court's clear precedent. Order at 11 (ER-11).

*First*, the district court rightly noted that "CONAE's acquisition of the

launch rights through contract is immaterial," because "[w]hat matters under the

statute is what the property is 'used for,' not how it was generated or produced." *Id.*

(citing *Af-Cap*, 475 F.3d at 1087). In so concluding, the district court correctly

applied this Court's reasoning in *Af-Cap*, which, in the context of intangible

obligations owed to a sovereign for various bonuses, taxes and royalties, explained

that "the rights were created by contract, which may have been a commercial

transaction, but that is irrelevant [as to] whether the rights were 'used.'" Order at 11

(ER-11) (citing *Af-Cap*, 475 F.3d at 1087). *See also Conn. Bank of Commerce*, 309

F.3d at 251 ("[E]ven if a foreign state's property has been generated by commercial

activity in the United States, that property is not thereby subject to execution or

attachment if it is not [also] 'used for' a commercial activity within our borders.").[11]

---

[11] NML's reliance on *Republic of Argentina v. Weltover Inc.*, 504 U.S. 607, 614-15
(1992) and *Corzo v. Banco Central de Reserva del Peru*, 243 F.3d 519, 525 (9th
Cir. 2001) to suggest that CONAE is "using" its contract rights for a commercial
activity is misplaced. NML Br. at 28-29, 31-34; Compl. ¶ 33 (ER-64). *Weltover*
and *Corzo* concerned the definition of "commercial activity" in the context of
Section 1605(a)(2)'s broader exception to *jurisdictional* immunity, and thus at
most would support the proposition that CONAE could be subject to jurisdiction
for a suit alleging breach of contract. *Weltover*, 504 U.S. at 611; *Corzo*, 243 F.3d

(continued . . .)

*Second*, the district court further ruled, correctly, that "maintenance in connection with a commercial activity . . . is [also] insufficient under *Af-Cap*, 475 F.3d at 1091." Order at 12 (ER-12). As the court observed, NML's strained argument that passive "maintenance" of contract rights (*i.e.*, ownership) somehow constitutes affirmative "use" of those rights boils down to the assertion that "an entity uses its contractual rights by failing to renege on them (i.e., maintaining its ability to perform its obligations at a future date)." *Id.* The district court noted that to characterize that lack of activity as "use" would "require[] lexicographical distension of an everyday word," in "violat[ion] [of] both the Ninth Circuit's adoption of a narrow definition [of 'used for'], *Af-Cap*, 475 F.3d at 1091, as well as the Court's obligation to apply a straightforward denotation [of that phrase], *see Cubic*, 495 F.3d at 1036 (directing courts to avoid 'strained analys[e]s of the words 'used for' and 'commercial activity')." *Id.*

Finally, NML is wrong that the district court improperly focused on the conduct of SpaceX, rather than CONAE, in assessing NML's "maintenance" argument. NML Br. at 30-31 (citing *Af-Cap*, 475 F.3d at 1091). NML argued below that CONAE "used" the contract rights to keep launch slots open, so the district

---

at 524. But as the Court has observed, the "litany of cases" applying the FSIA's commercial activity exception to jurisdictional immunity "fails to enlighten [a] discussion" of Section 1610 execution immunity "because none of them analyze the pivotal phrase at issue . . . 'used for a commercial activity in the United States.'" *Af-Cap*, 475 F.3d at 1090.

court referenced the conduct in which SpaceX engages "as a result" of the contract

at issue (*i.e.*, purportedly keeping the launch slots open), Order at 11 (ER-11). In

doing so, the district court was analyzing NML's misplaced FSIA argument, and not

improperly finding – contrary to *Af-Cap* – that the conduct of SpaceX, a non-

sovereign third party, was a basis for determining that CONAE was using property

for a commercial activity. *See Af-Cap*, 475 F.3d at 1091 (third parties cannot waive

a foreign state's exeuction immunity); *Aurelius Capital Partners, LP*, 584 F.3d at

131 (same). In any event, the district court's logic in rejecting NML's

"maintenance" contention – that it flunks this Court's plain language requirement by

equating "use" of contract rights with failing to renege on them – clearly applies to

the conduct of all parties to the relevant contract, including CONAE. *See* Order at

12 (ER-12).

   2.   *NML's Latest Strained Arguments Fail*

         NML otherwise now raises new arguments unsupported by the factual

allegations in its Complaint – that CONAE is "using" the contract rights both by

"drawing on them . . . to obtain pre-launch services," NML Br. at 23, and by

"secur[ing] commercial services in the future" with them, NML Br. at 27. While

the phrase "pre-launch services" appears 24 times in NML's appellate brief, it does

not make a single appearance in NML's Complaint, or for that matter in NML's

opposition in the district court to the motions to dismiss or the argument transcript.

That argument was accordingly waived. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) (this circuit "will not consider arguments that are raised for the first time on appeal").

Remarkably, NML nonetheless accuses the district court of "ignor[ing] NML's allegations regarding SpaceX's pre-launch services." NML Br. at 25. All of the citations in NML's appeal brief in support of its new "pre-launch services" theory are not in the Complaint, but were put before the district court in February 2015, after argument on the motions to dismiss had taken place, in connection with NML's discovery motion. *See id.* at 24-25. As lawyers' arguments in a brief, they are insufficient to save NML's Complaint. Fed. R. Civ. P. 12(b); *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995) (material outside the pleadings cannot be considered on a motion to dismiss); *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1350 (C.D. Cal. 2014) ("In deciding a motion to dismiss, courts may not 'take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).' The effect of plaintiffs' request that the court take judicial notice of Exhibit Q is the same, and the court declines to do so for that reason" (internal citation omitted)).[12]

---

[12] NML is incorrect to repeatedly state that the Republic "conceded" that its satellite launches require extensive pre-launch services. *See, e.g.*, NML Br. at 26.

(continued . . .)

Regardless, even if NML's novel arguments were supported by its Complaint, they would still fail as a matter of law under this Court's precedent and warrant the Complaint's dismissal:

NML is wrong that CONAE is "using" its contract rights, under FSIA Section 1610(a)'s narrow construction, by "drawing" on them "to obtain pre-launch services from SpaceX that are necessary to launch satellites into orbit." NML Br. at 23. In effect, NML argues that CONAE "uses" its right to receive contractual consideration in order to obtain the ultimate contractual consideration itself. But this strained reading of the word "use" is the precise kind of "lexicographical distension of an everyday word" that the district court properly rejected below as violating this Court's rulings in *Af-Cap* and *Ministry of Def. & Support for Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys. Inc.*, 495 F.3d 1024 (9th Cir. 2007), *vacated on other grounds*, 546 U.S. 450 (2006). *See* Order at 12 (ER-12). Notably, notwithstanding the frequency with which foreign states enter into contracts with U.S. entities, NML does not cite a single case adopting this incorrect theory.

---

In its opposition to NML's motion to expedite this appeal, the Republic characterized NML's position, stating: "*NML itself* contends that as time progresses, the *supposed* 'marketability' of these rights *purportedly* decreases correspondingly, because they become more uniquely tailored to CONAE's specific satellites." Republic's Opp. to Appellant's Mot. to Expedite Briefing and H'rg on Appeal, *NML Capital, Ltd. v. Republic of Argentina*, No. 15-55449, at 3 (2d Cir. Apr. 3, 2015), ECF No. 13 (emphasis added).

To the contrary, other circuit courts agree that, in accordance with the plain meaning of "used for," property *received* by a foreign state in a purportedly commercial transaction – like the alleged contract rights here – is not deemed to have been "used" by the foreign state, absent some affirmative "use" in a separate, subsequent activity. As the Fifth Circuit explained:

> In ordinary usage, we would not say that the revenue from a transaction is "used for" that transaction. For example, in return for an employee's service to his employer, he generally receives revenue in the form of a salary. It would be strange to say that "The employee uses his salary for his job." He earns his salary from his job, but he *uses* it to pay the rent, buy groceries, and so forth. The revenue from a commercial transaction does not have the instrumental relationship to the commercial activity denoted by the phrase "used for;" it is not put in service of that activity, instead it is the end result . . . from the activity.

*Conn. Bank of Commerce*, 309 F.3d at 254 (emphasis in original).

It would be equally strange to say that contract rights to receive various purported pre-launch services from SpaceX are being "used" by CONAE for obtaining the pre-launch services themselves. While CONAE may have "used" the funds it paid to SpaceX (which funds are now the property of SpaceX) to obtain the consideration at issue, CONAE is clearly not "using" any derivative contract rights in any common sense of the word. As the Court explained in *Cubic*, "use" of intangible rights, such as those at issue here, occurs when those rights are actively employed for an activity distinct from the underlying contract, such "as security on a

32

loan [or] as payment for goods." *Cubic*, 495 F.3d at 1037. CONAE, however, is doing nothing of the sort with its right to receive SpaceX's services. It is not "putting them into action" or "putting them into service" for any activity at all – rather those rights are, and will remain, unused in CONAE's possession until they extinguish upon SpaceX's fulfillment of its contractual obligations.[13]

NML is equally misguided in asserting that CONAE is "using" the contract rights for commercial activity because CONAE is "employing them now to secure commercial services in the future (namely, the September 2015 and September 2016 launches, and the associated services)." NML Br. at 27. In support of this argument, NML cites *Af-Cap*'s "reliance" on *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989), for the proposition that using a letter of credit to secure future services constitutes commercial "use." *See* NML Br. at 27. But as the Court noted in *Af-Cap*, the foreign state in *Atwood* "used" the letter of credit because "it '*spent*' [it] on that [commercial] activity" in an *entirely separate transaction*. *Af-Cap*, 475 F.3d at 1092. (quoting *Conn. Bank of Commerce*, 309 F.3d at 258 (emphasis added)). Here, there is no such separate

---

[13] At the time of launch, it will be SpaceX using its facilities to launch the satellites, which as the district court held in *NML I*, will not be "used" until later, when they are "in space." *NML I*, 788 F. Supp. 2d at 1122. Any suggestion in the Order that "use" of derivative contract rights might occur before then, when "the launch process begins," Order at 12 (ER-12), would nullify that prior, correct ruling and similarly misdefine "use" to include failing to renege on a contract. *Id.*

transaction – CONAE did not "spend" the contract rights to secure any future right, rather it "spent" its money to *receive* those rights from SpaceX.

None of the three "colloquial" examples of supposed "use" provided by NML cures the flaw in its reasoning. *See* NML Br. at 28. NML states that a steel mill "uses" a contract to lock up a lawyer's "future services;" that a purchaser of an option contract is "using that right today to lock in a favorable price;" and that an airline's prepayment for fuel constitutes the "use" of rights to receive fuel later. *Id.* As an initial matter, these examples conflate the ownership of contract rights with their "use," thereby improperly reading out of Section 1610(a) the requirement that property not only be owned by the foreign state but also be used by it. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof")

Moreover, each of NML's examples requires a strained reading of the word "use" in a manner contrary to this Court's precedent and common parlance. A contract is a set of promises, in which "the consideration induces the making of the promise and the promise induces the furnishing of the consideration." Restatement (Second) of Contracts § 71 cmt. b. The steel mill, the option contract purchaser, and the airline do not "use" their *contracts* to obtain the respective counterparties' promises. Rather, they use *money* or other *consideration* to obtain the counterparties' performance. The right to receive consideration is not itself "used"

for anything, but rather it is only the embodiment of the parties' bilateral promises. *Id.* § 1.

NML is also wrong to claim that the district court purportedly failed to accept as true various factual allegations in the Complaint, *see e.g.*, NML Br. at 25, 30, and to otherwise suggest that it was error to dismiss the Complaint without reviewing the relevant contract. *Id.* at 25. The district court *did* make all inferences in NML's favor, Order at 11-12 (ER-11-12), and the contract is irrelevant to the question of whether NML's Complaint adequately stated a claim for relief. *See Jacobson*, 50 F.3d at 1496 (material outside the pleadings cannot be considered on a motion to dismiss). In any event, the determinative issue in both instances is that NML's novel FSIA legal theories are deficient as a matter of law, and no well pled allegation – including any in the Complaint – or amount of discovery could have saved it from dismissal.

### C. NML's Complaint Further Failed To Adequately Allege That Any Use Of The Contract Rights Is Commercial In Nature

Even if the Complaint adequately pled that CONAE is "using" the contract rights, the Order may still be affirmed because the Complaint failed to sufficiently plead that any "use" was commercial in nature. *See Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 219 (9th Cir. 2013) ("We may affirm on any basis supported by the record, whether or not relied upon by the district court.").

As an initial matter, NML is wrong to contend that "the district court correctly recognized that Argentina was engaged in commercial activity," NML Br. at 32 (citing Order at 12 (ER-12)), because the district court stated that SpaceX's conduct was "in connection with a commercial activity." Order at 12 (ER-12). While SpaceX's business may be to design, manufacture and launch rockets and spacecraft, that does not answer the question of whether CONAE is itself engaged in commercial activity. *See Aurelius Capital Partners, LP*, 584 F.3d at 131 ("The commercial activity of the private corporations who managed these assets are irrelevant to [the] inquiry [as to whether a foreign state is using property for a commercial activity].").

As NML cannot contest, and as the Complaint did not and could not plead, the CONAE satellites at issue here are *not* commercial in nature because they are part of a governmental space mission. *NML I*, 788 F. Supp. 2d at 1125 n.5 (CONAE's satellite "may not be subject to execution [] because '[t]he alleged conduct itself – giving away [information] – is not a commercial activity"(internal citation omitted)). NML itself acknowledges here that the satellites are part of "an international space mission to study the global environment," and that "[t]o further this mission over the next two years, CONAE plans to launch satellites from sites in the United States to observe climatological and environmental phenomena." NML Br. at 13; *see also id.* at 46 ("[A]s the district court found, 'there is nothing

commercial about CONAE's space program'"); *cf. NML I*, 788 F. Supp. 2d at 1124 (NML "seemingly agrees that the [space mission] collaboration is sovereign in nature.").

NML nonetheless argues, counterintuitively, that the derivative contract rights that are purportedly used to launch those noncommercial satellites are somehow themselves commercial, because "[p]rivate companies, acting in the regular course of their commercial operations, regularly obtain launch services from SpaceX." NML Br. at 32. NML then states that the Republic's "use" of those services is therefore "commercial activity" because it is "the *type* of actio[n] by which a private party engages in 'trade and traffic or commerce.'" *Id.* (quoting *Weltover*, 504 U.S. at 614). In support of this argument, NML recites the example given by the Supreme Court in *Weltover* to demonstrate which *types* of actions are commercial: "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Weltover*, 504 U.S. at 614-15. The district court rejected this argument in *NML I*, and this Court should do so here.

NML's example from *Weltover* is inapposite to its allegations of commercial "use." It is true that a foreign army's purchase of bullets in the United States is a commercial activity (regardless of that army's intended use of the bullets) such that a seller could maintain jurisdiction under the FSIA's commercial

37

activities exception, 28 U.S.C. § 1605(a)(2), in a suit for breach of that purchase contract. However, the army's maintenance of the bullets for eventual use in armed conflict would not be a use for commercial activity, which means that a third-party creditor could not attach the bullets to satisfy a judgment. *See supra* 27-28 n.11.

As the district court in *NML I* noted, NML misdefines the nature of any purported "use":

> Plaintiff confuses the analysis by asking the Court to consider ["activity" unrelated to any "use". . . . The relevant conduct to this action is Defendant Argentina's participation in a joint program with other nation-states to conduct a scientific and humanitarian mission, whereby data on the earth's ocean will be collected from space and will be disseminated for free to the scientific community. The conduct encompasses both pre-launch activities, like testing and preparation, and post-launch activities, mainly the gathering of information from space.

*NML I*, 788 F. Supp. 2d at 1123-24 (internal citation omitted).

The court in *NML I* thus properly refused to accept NML's assertion that the satellite was being used for a commercial activity simply because private parties also engage in some of the pre-launch activities involved in the mission:

> Although Plaintiff may be correct, in that private companies employ satellite buses and operate remote sensing satellites, that fact in and of itself is not dispositive. . . . It also matters whether the collection of and distribution of oceanographic data at no cost are "part of the trade and commerce engaged in by a 'merchant in the marketplace.'" They are not. In addition, a private party would not be gathering data and distributing it to promote the interests of all of humanity.

*Id.* at 1125 n.5 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 92

(2d Cir. 2008), *abrogated on other grounds*, *Samantar v. Yousuf*, 560 U.S. 305

(2010)); *see also Kato v. Ishihara*, 360 F.3d 106, 111-12 (2d Cir. 2004) (finding an

instrumentality was engaged in the *promotion* of commerce, as opposed to engaged

in commerce itself, where "[a]lthough a private Japanese business might engage in

these activities on its own behalf . . . such a business would not typically undertake

the promotion of other Japanese businesses, or the promotion of Japanese business

interests in general.").

   The same analysis applies to the contract rights at issue here and

renders them sovereign, and not commercial, in nature. They are clearly

encompassed in the indisputably governmental mission's "pre-launch activities,"

and are thus not "commercial," notwithstanding that private parties may engage in

similar conduct in other contexts. Like in *NML I*, the contract for launch services

here gives the mission no more than at most a "passing connection" to commercial

activity, which is insufficient to convert the conduct at issue from sovereign to

commercial in nature. *Af-Cap*, 475 F.3d at 1088 ("use" is "most sensibly read to

mean active employment for commercial purposes, and not merely a passive,

passing, or past connection to commerce." (quoting *Jones v. United States*, 529

U.S. 848, 855 (2000))). Just as the fact that a "presidential airplane requires

periodic service and maintenance does not mean that it is being 'used for'

commercial activity," *Colella v. Republic of Argentina*, No. C 07-80084 WHA, 2007 WL 1545204, at *6 (N.D. Cal. May 29, 2007), the fact that a sovereign's exploration of space requires a launch contract does not alter the noncommercial nature of its conduct.

If the law were otherwise, judgment creditors could interfere with a host of clearly immune sovereign property – including a presidential plane, *see id.* – simply by attaching the contract rights that are necessary to "use" it. Under NML's theory, a judgment creditor could prevent an embassy from contracting for electricity, running water, and telephone services – effectively paralyzing it from functioning at all – unless and until a foreign state's judgments were paid. As NML's utter lack of authority for this proposition demonstrates, that is not the law.

## POINT II

### THE COURT MAY ALSO AFFIRM BECAUSE NML FAILED TO ADEQUATELY ALLEGE ALTER EGO, AND THUS THAT CONAE IS LIABLE FOR THE REPUBLIC'S DEBTS OR SUBJECT TO JURISDICTION

Beyond the FSIA-based infirmities of NML's Complaint, the Court may affirm the Order on the grounds, raised below, that the Complaint failed to sufficiently plead that CONAE, a legally distinct entity, is liable for the Republic's debts or subject to jurisdiction here based on the Republic's jurisdictional immunity waiver. *See Muniz*, 738 F.3d at 219.

*First*, as the district court recognized, it is well established that for purposes of liability, separate juridical entities established by foreign states are entitled to a strong presumption that they are separate from their parent states and thus not liable for the state's debts. *See Bancec*, 462 U.S. at 626-27 ("government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such. . . . [and] the instrumentality's assets and liabilities must be treated as distinct from those of its sovereign"); *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1069-74 (9th Cir. 2002) (judgment creditor of Iran could not execute on property of an Iranian instrumentality because it had not overcome the presumption of separateness).

This presumption of separateness can be overcome only by establishing that the sovereign entity is the parent state's "alter ego" – claims that NML did not even allege in its Complaint. NML was required to allege facts sufficient to rebut "the presumption of [CONAE's] separate juridical status . . . in [one of] two ways" – either by claiming that CONAE "is so extensively controlled by [the Republic] that a relationship of principal and agent is created," or that respecting CONAE's separate status "would work 'fraud or injustice.'" *Flatow*, 308 F.3d at 1070 (citing *Bancec*, 462 U.S. at 629). Because the Complaint was devoid of any such allegations, it was deficient as a matter of law and the Court can affirm its dismissal on that ground as well.

Regardless, even if NML had raised alter ego allegations, they would necessarily fail, as the record establishes that any claim of alter ego is contradicted by the facts. CONAE conforms to the "typical government instrumentality" described by the Supreme Court in *Bancec*. There, the Supreme Court noted that the paradigmatic "agency or instrumentality" is an entity that was:

   i.   "[C]reated by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law;"

   ii.  "established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued;" and

   iii. "primarily responsible for its own finances."[14]

*Bancec*, 462 U.S. at 624.

As the National Decree creating CONAE as a separate autarkic (*i.e.*, self-sufficient), legal entity makes clear, CONAE shares all of these features. Specifically, CONAE was:

   i.   Created by Decree No. 995/1991, dated May 28, 1991, which prescribes CONAE's powers and duties, Compl. Ex. C at Arts. 3-4

_____

[14] These features overlap with the test that the Court applies to determine whether an entity constitutes an "organ" and therefore an "agency or instrumentality" under Section 1603(b)(2). *See Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008) ("To determine whether an entity [is an "organ"], 'courts examine the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law.'" (internal citation omitted)).

(ER-79-80), and specifies that CONAE is to be managed by a Board of Directors primarily selected by the Argentine Executive. *Id.* at Art. 5 (ER-79);

ii. Established as a separate legal entity "with power to act publicly and privately," *id.* at Art. 1 (ER-78), to issue internal regulations and establish its structure, enter into agreements with private and public entities, engage in acts of trade, and perform all the legal acts necessary for its normal operation, *id.* at Art. 4 (ER-79); and

iii. Designed to have "full management and financial independence," *id.* at Art. 1(ER-78), with a duty to "[o]btain the financial resources necessary for performance of its activities," *id.* at Art. 3 (ER-79); *see also id.* at Art. 6 (ER-80) (budget application must include CONAE's "[i]ncome from the economic and commercial exploitation of patents, license[s], consulting, providing of services, and any other income originating in the activity that it performs" as well as "[i]ncome from performance of research and studies").

*See also* Decl. of Oleh Jachno ¶¶ 3-5, *NML I*, No. 11 Civ. 3507 (C.D. Cal. May 2, 2011) (Varotto Decl. Ex. B) (ER-50-51); *Seijas v. Republic of Argentina*, 502 F. App'x 19, 22-23 (2d Cir. 2012) (Banco de la Nación Argentina ("BNA") – a separate autarkic legal entity wholly owned by the Republic – is not the Republic's alter ego where "Argentina exercised its rights as sole shareholder to appoint BNA's directors, BNA's lending activity was consistent with Argentinian law and its charter, and BNA arguably could have been more transparent in its accounting practices."). There accordingly can be no reasonable dispute that CONAE is

entitled to a presumption that it is a separate legal entity that is not liable for the Republic's debts.[15]

As it did below, NML seeks to circumvent this barrier to its creditor's suit and the Supreme Court's express directive in *Bancec* that the FSIA "*is not intended to affect the substantive law of liability.*" 462 U.S. at 620 (emphasis added); *see also Flatow*, 303 F.3d at 1069 ("[T]he FSIA does not resolve questions of liability. . . . This distinction . . . is crucial."); *Doe*, 557 F.3d at 1073 (the FSIA "does not set out any substantive rules of liability"). NML thus asserts that that this Circuit applies the so-called "core functions" test, rather than *Bancec*, to determine whether an entity is substantively liable for the debts of a foreign state. Compl. ¶¶ 17-28 (ER-59-63). The district court properly rejected this novel argument. Order at 8 n.5 (ER-8) ("[T]he Court's application of the core functions test will [not] determine substantive liability.").

---

[15] *See EM Ltd.*, 2009 WL 3149601, at *6, *vacated in part on other grounds*, 2010 WL 3910604 (S.D.N.Y. Sept. 30, 2010) (autarkic "legally and financially independent entity created 'to promote scientific research concerning agriculture and cattle ranching'" was agency or instrumentality of Republic); *Powerex Corp.*, 533 F.3d at 1098 (Canadian province's electric power distributor was agency or instrumentality); *see also Alperin v. Vatican Bank*, 360 F. App'x 847, 849 (9th Cir. 2009) (Vatican Bank created as a "public and independent juridic entity. . . responsible for managing assets placed in its care for the purpose of supporting religious or charitable works" was an agency or instrumentality); *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd.*, 476 F.3d 140, 143 (2d Cir. 2007) (*per curiam*) (Korean agency created "for the national purpose of examining, supervising, and investigating Korean financial institutions" was an agency or instrumentality).

As the district court recognized, the "core functions" test does not and cannot deal with questions of substantive liability, *id.*, much less create an exception to the narrow circumstances under which *Bancec* permits disregard of the legal identity of a separate entity in order to impose liability on it for the state's obligations. The "core functions" test applies only in certain instances in the context of determining whether a given entity is the state itself, on the one hand, or an agency or instrumentality of the state, on the other, for purposes of applying FSIA provisions that distinguish between the two, such as provisions that impose different jurisdictional standards under the expropriation exception to FSIA immunity, different service requirements, and different scopes of execution. *See Garb*, 440 F.3d at 582 (applying "core functions" test to interpret FSIA Section 1605(a)(3)); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) (applying "core functions" test to interpret FSIA Section 1608); *Cubic*, 495 F.3d at 1035-36 (applying "core functions" test to interpret FSIA Section 1610(b)).[16]

---

[16] Contrary to NML's suggestion, NML Br. at 37, *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234-35 (D.C. Cir. 2003) did not apply the "core functions" test to affect the substantive law of liability, but rather to interpret the FSIA's terrorism exception to jurisdictional immunity. Order at 7 (ER-7); *see also Garb*, 440 F.3d at 593. Moreover, the Second Circuit's pre-*Garb* decision in *Noga* did not apply the "core functions" test at all in finding no legal distinction between the Russian Federation and one of its "political organs," the Russian Government. *Compagnie*

(continued . . .)

This case law thus does not support NML's theory that a judgment creditor can use the FSIA's provisions to hold a separate juridical entity *liable* for a foreign state's debts. In fact, the Supreme Court in *Bancec* expressly "decline[d] to adopt" the "core functions" test in the context of assigning liability, noting that its ruling was *not* based on a "standard in which the determination whether or not to give effect to the separate juridical status of a government instrumentality turns in part on whether the instrumentality in question performed a 'governmental function.'" *Bancec*, 462 U.S. at 633 n.27. *See also id.* ("[T]he concept of a 'usual' or 'proper' governmental function changes over time and varies from nation to nation."); *Noga*, 361 F.3d at 693 (Jacobs, J., concurring) ("[E]ven though the Federation may be 'interpos[ing] its separate juridical status' . . . to defeat a legitimate claim for arbitral confirmation, *Bancec* requires that we start with a robust presumption that the Government and the Federation are separate juridical entities." (internal citation omitted)).[17]

---

*Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*, 361 F.3d 676, 688 (2d Cir. 2004).

[17] NML's exaggerated concerns that supposedly result from adhering to the Supreme Court's directive in *Bancec* by using "[s]eparate tests" in "different contexts" are unconvincing. *See* NML Br. at 39 (claiming that applying *Bancec* in the liability context would be "complicated" and contrary to the FSIA's comprehensive scheme). The purpose of the FSIA is to provide a "comprehensive set of legal standards" *concerning foreign sovereign immunity*, not the substantive law at issue in disputes against sovereigns. *Id.* at 39 (internal citation omitted).

(continued . . .)

NML is also wrong to argue that the "core functions" test "accords with international law" and should be adopted because it is a purportedly simple test to apply.  *See* NML Br. at 40-41.  The single case that NML cites in support of this proposition is inapposite because it involves an entity lacking separate legal personhood.  *See Noga*, 361 F.3d at 685 (under Russian law, the Russian Government "is a political organ of the Russian Federation, analogous to the cabinet of the American president").  NML's international law argument thus assumes its own conclusion, and has no application here.  Moreover, alleged "administrative ease" is not grounds for ignoring the separate status of entities under the laws of the countries in which they reside, nor does it justify disregarding the required showing of alter ego set forth by the Supreme Court in *Bancec*.  *See Bancec*, 462 U.S. at 611.

*Second*, NML's failure to plead alter ego similarly forecloses its assertion that CONAE is subject to jurisdiction in this proceeding, and is another

---

Nor is NML correct that the "core functions" test should be applied to liability determinations because it is purportedly "consistent with the federal common law governing domestic agencies."  *Id.* at 39-40 (citing *Noga*, 361 F.3d at 688-89).  *Noga*'s  application of the "same standard that has been adopted by the Supreme Court in determining whether an agency or instrumentality of a state is entitled to Eleventh Amendment Immunity" requires that "an entity's assets are not separate from those of the state," *Noga*, 361 F.3d at 688, not that its core functions be commercial.  In any event, NML's insistence that the "core functions" test be applied here runs afoul of the Supreme Court's decision in *Bancec*, which refused to disregard the separateness of an entity based solely on the nature of its functions.  *See Bancec*, 462 U.S. at 634 n.27.

basis for the district court to affirm the dismissal of the Complaint. Although the "core functions" test applies in certain other contexts to determine whether an entity is distinct from a foreign sovereign for jurisdictional purposes, the district court erred in applying it here to answer the question of whether CONAE is subject to jurisdiction in this action based on the Republic's waiver of immunity in its bond documentation. Order at 6-7 (ER-6-7).

As NML cannot contest, since the D.C. Circuit created the "core functions" test in *Transaero*, courts of appeals have applied it to equate entities with parent states *only* in the context of ruling that governmental departments, ministries, or treasuries that are part and parcel of foreign state governments should be treated as the foreign states themselves. *See, e.g.*, *Transaero*, 30 F.3d at 153 ("armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself"); *Garb*, 440 F.3d at 594 ("the Ministry of the Treasury would appear to be an integral part of Poland's political structure" (internal citation omitted)); *Cubic*, 495 F.3d at 1035 ("[W]e adopt a strong presumption that the armed forces constitute a part of the foreign state itself"); *Wye Oak Tech.*, 666 F.3d at 215 (Iraq's Ministry of Defense not separate from Iraq); *Roeder*, 333 F.3d at 234-35 (Iran's Ministry of Foreign Affairs not separate because "[t]he conduct of foreign affairs is an important and 'indispensable' governmental function."); *Magness v. Russian Fed'n*, 247 F.3d

609, 613 n.7 (5th Cir. 2001) (the Russian Ministry of Culture is a political

subdivision of the Russian Federation).

Outside of these core governmental departments and ministries, courts

continue to find sovereign entities separate without applying the "core functions"

test, even where those entities, like CONAE, clearly do not perform commercial

functions. *See European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 148 (2d Cir.

2014) (finding the European Community to be an agency or instrumentality

separate from the parent member-states); *Peninsula Asset Mgmt.*, 476 F.3d at 142

(Korea's Financial Supervisory Service, which has "oversight duties similar to this

country's [SEC]," is "agency or instrumentality").

The cases cited by the district court (and distinguished above) are not

to the contrary, and do not support disregarding the separateness of an entity such

as CONAE that, unlike the above-mentioned ministries and departments, *was*

created as a separate, self-sufficient agency. As an entity with "full management

and financial independence" and its own Board of Directors, Compl. Ex. C at Art.

1 (ER-78), CONAE is plainly not "bound up" in or an "integral part of" the

Republic's governmental structure. Nor are space exploration and research

"indispensable" to the functioning of a government, as is the conduct of foreign

affairs.

The district court was thus wrong to accept NML's invitation to invoke the "core functions" test's categorical labels and to thus be faced with a false choice – either hold that CONAE's core functions are commercial in nature, which is not true, or hold that CONAE is indistinguishable from the Republic, which is also certainly not the case. The "core functions" test was not designed to be applied in cases like this one, and courts have accordingly refrained from doing so. The Court should reverse the district court's erroneous decision below and hold that, in addition to liability, the *Bancec* standard – which NML failed to plead – applies to the question of jurisdiction in this context as well.

## CONCLUSION

For the foregoing reasons, this Court should affirm the Order.

## STATEMENT OF RELATED CASES

The Republic is not aware of related cases pending before this Court.

Dated:   New York, New York
         June 29, 2015

                  Respectfully submitted,

                  CLEARY GOTTLIEB STEEN & HAMILTON LLP

                  By:    /s/ Carmine Boccuzzi
                       Jonathan I. Blackman (jblackman@cgsh.com)
                       Carmine D. Boccuzzi (cboccuzzi@cgsh.com)
                       Michael M. Brennan (mbrennan@cgsh.com)

                  One Liberty Plaza
                  New York, New York 10006
                  (212) 225-2000

                  *Attorneys for the Republic of Argentina*

# CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to Ninth Circuit Rule 32-1 that:

1.     This brief complies with Fed. R. App. P. 32(a)(7)(B)(i), because it contains 12,566 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  New York, New York
        June 29, 2015

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____ /s/ Carmine Boccuzzi _____
Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for the Republic of Argentina*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2015 I electronically filed the foregoing Brief of Defendant-Appellee The Republic of Argentina with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/Terrie Auzenne*