No. 15-55449

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NML CAPITAL, LTD.,

*Plaintiff-Appellant*,

v.

SPACE EXPLORATION TECHNOLOGIES CORP.,
a.k.a. SPACEX, a Delaware corporation;
and THE REPUBLIC OF ARGENTINA, a foreign state,
including its *COMISIÓN NACIONAL DE ACTIVIDADES ESPACIALES*,
a political subdivision of the Argentine State, a.k.a. CONAE,

*Defendants-Appellees*.

From the United States District Court
for the Central District of California
Case No. 2:14-cv-02262-SVW-Ex
The Honorable Stephen V. Wilson

## REPLY BRIEF FOR APPELLANT NML CAPITAL, LTD.

HAROLD A. BARZA
BRUCE E. VAN DALSEM
IAN S. SHELTON
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
Telephone: 213.443.3000
Facsimile: 213.443.3100

THEODORE B. OLSON
MATTHEW D. MCGILL
SCOTT P. MARTIN
CHRISTOPHER B. LEACH
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Counsel for Plaintiff-Appellant NML Capital, Ltd.*
[*additional counsel listed on inside cover*]

STEVEN A. ENGEL
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone: 212.698.3500
Facsimile: 212.698.3599

ALEXANDER K. MIRCHEFF
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7307
Facsimile: 213.229.6307

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

ARGUMENT ..................................................................5

I.   Argentina's Launch Services Rights Are Being "Used For A Commercial Activity In The United States" ..................................5

  A.   Argentina Is Currently Using Its Contractual Launch Services Rights..................................................................5

     1.   Argentina Is Using The Launch Services Rights To Acquire And Use SpaceX's Pre-launch Services ......................5

     2.   Argentina Is Using The Launch Services Rights To Secure Future Launches.............................................12

  B.   Argentina's Usage Is Commercial Activity .........................14

II.  CONAE Is Argentina's Political Subdivision, And Therefore Is Bound By Argentina's Waiver Of Immunity From Jurisdiction And Liable For Its Debts ....................................................17

  A.   The Core Functions Test Governs Whether CONAE Is A Separate Legal Person For Purposes Of Both Liability And Jurisdiction Under The Foreign Sovereign Immunities Act ..............18

  B.   CONAE Is Not A Separate Legal Person ...........................27

CONCLUSION ................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Akhtar v. Mesa*,
   698 F.3d 1202 (9th Cir. 2012)..................................................................8

*Alperin v. Vatican Bank*,
   360 F. App'x 847 (9th Cir. 2009) .......................................................29

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................7

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
   875 F.2d 1174 (5th Cir. 1989)............................................................13

*Banco Nacional De Cuba v. Chase Manhattan Bank*,
   505 F. Supp. 412 (S.D.N.Y. 1980)......................................................20

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................................6

*Cal. Dep't of Water Res. v. Powerex Corp.*,
   533 F.3d 1087 (9th Cir. 2008)............................................................29

*Colella v. Republic of Argentina*,
   No. C 07-80084 WHA, 2007 WL 1545204 (N.D. Cal. May 29, 2007) . 16, 17, 18

*Compagnie Noga D'Importation & D'Exportation S.A. v. Russian Fed'n*,
   361 F.3d 676 (2d Cir. 2004)........................................................ 22, 26

*Conn. Bank of Commerce v. Republic of Congo*,
   309 F.3d 240 (5th Cir. 2002)..............................................................11

*EM Ltd. v. Republic of Argentina*,
   473 F.3d 463 (2d Cir. 2007)........................................................ 11, 28

*European Cmty. v. RJR Nabisco, Inc.*,
   764 F.3d 129 (2d Cir. 2014)........................................................ 28, 29

*Exp.-Imp. Bank v. Grenada*,
   768 F.3d 75 (2d Cir 2014)..................................................................14

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) ............................................................ 18, 19, 20, 21, 25, 29

*In re 650 Fifth Ave.*,
  No. 08 Civ. 10934, 2014 WL 1516328 (S.D.N.Y. Apr. 18, 2014)....................11

*Johnson v. United States*,
  — U.S. —, No. 13-7120, 2015 WL 2473450 (June 26, 2015)..........................24

*Magness v. Russian Fed'n*,
  247 F.3d 609 (5th Cir. 2001)...............................................................26

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008).............................................................10

*McBride v. Lopez*,
  — F.3d — , No. 12-17682, 2015 WL 3953483 (9th Cir. June 30, 2015)..........24

*Ministry of Def. & Support for the Armed Forces of the
  Islamic Republic of Iran v. Cubic Def. Sys., Inc.*,
  495 F.3d 1024 (9th Cir. 2007)................................................... 4, 11, 21

*NML Capital, Ltd. v. Republic of Argentina*,
  680 F.3d 254 (2d Cir. 2012).................................................................15

*NML Capital, Ltd. v. SpacePort Sys. Int'l, L.P.*,
  788 F. Supp. 2d 1111 (C.D. Cal. 2011) .................................... 3, 15, 16

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
  779 F.3d 1036 (9th Cir. 2015)................................................................9

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*,
  476 F.3d 140 (2d Cir. 2007).................................................................29

*Republic of Argentina v. NML Capital, Ltd.*,
  134 S. Ct. 2250 (2014) .........................................................................7

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) .................................................... 3, 11, 14, 15, 16

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Roeder v. Islamic Republic of Iran,*
    333 F.3d 228 (D.C. Cir. 2003) ...............................................................22

*Sachs v. Republic of Austria,*
    737 F.3d 584 (9th Cir. 2013).................................................................23

*Seijas v. Republic of Argentina,*
    502 F. App'x 19 (2d Cir. 2012)..............................................................28

*SerVaas Inc. v. Republic of Iraq,*
    No. 10-828-cv, 2011 WL 454501 (2d Cir. Feb. 16, 2011) ...................23

*Sheppard v. David Evans & Assoc.,*
    694 F.3d 1045 (9th Cir. 2012).................................................................7

*Shroyer v. New Cingular Wireless Servs., Inc.,*
    622 F.3d 1035 (9th Cir. 2010).................................................................7

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011).................................................................7

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
    30 F.3d 148 (D.C. Cir. 1994) ................................................................22

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,*
    199 F.3d 94 (2d Cir. 1999)....................................................................23

*Weissburg v. Lancaster Sch. Dist.,*
    591 F.3d 1255 (9th Cir. 2010)...............................................................10

*Wye Oak Tech., Inc. v. Republic of Iraq,*
    666 F.3d 205 (4th Cir. 2011).................................................................23

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) ..............................................................................10

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

## Statutes

28 U.S.C. § 1603 ............................................................ 19, 24, 29

28 U.S.C. § 1605 ................................................................... 23

28 U.S.C. § 1610 .................................................................. 1, 5

## Rule

Fed. R. Civ. P. 8 ..................................................................... 6

## Other Authorities

Draft Articles on Responsibilities of States for
    Internationally Wrongful Act ............................................. 26

SpaceX, Capabilities & Services .......................................... 17

Williston on Contracts (4th ed.) .......................................... 12

## INTRODUCTION

Through its national space agency, CONAE, the Republic of Argentina ("Argentina") contracted with a private American company, SpaceX, to use SpaceX's launch facilities and its extensive pre-launch services to launch two satellites into space (the "Launch Services Rights"). In so doing, Argentina participated in the growing private market for space-launch services and thus engaged in "commercial activity" under the Foreign Sovereign Immunities Act of 1976 ("FSIA").

Argentina is currently using its Launch Services Rights to obtain valuable pre-launch services from SpaceX and to hold open Argentina's September 2015 and September 2016 launch dates. As NML Capital, Ltd. ("NML") explained in its opening brief, its creditor suit to attach Argentina's Launch Services Rights sufficiently alleged that those rights are not immune from attachment under the FSIA because Argentina was "us[ing]" them "for a commercial activity in the United States." 28 U.S.C. § 1610. Argentina's responsive brief suggests no sound basis for reaching a contrary conclusion.

*First*, NML's Complaint squarely pleaded that Argentina is using its Launch Services Rights. Argentina makes no attempt to defend the district court's reasoning that Argentina would not be "using" the Launch Services Rights "until the

launch process begins," ER 12[1]—undoubtedly because that reasoning would lead to the absurd result that NML could attach those rights, but *only* for the few moments that Argentina's satellite sat atop SpaceX's rockets. Instead, Argentina maintains that NML somehow forfeited its arguments regarding Argentina's use of the Launch Services Rights. This is nonsense. NML's Complaint, the Complaint's exhibits, and NML's district court briefing demonstrate beyond dispute that NML raised these arguments below. Argentina's remaining contentions that it is not using the Launch Services Rights contort the plain-meaning interpretation of "use" that this Court articulated in *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*: Argentina has "put" its Launch Services Rights "into action" in order to obtain SpaceX's pre-launch services and to hold open its right to launch satellites using SpaceX's facilities. *See* 475 F.3d 1080, 1091 (9th Cir. 2007).

*Second*, NML's Complaint also pleaded that Argentina's use of the Launch Services Rights was a "commercial activity" because Argentina acted like any private consumer of space-launch services when it entered into its agreement with SpaceX. Argentina attempts to obscure this simple truth by mischaracterizing the property that NML seeks to attach. NML seeks to attach *only* Argentina's contrac-

---

[1] Abbreviations are as follows: "ER" – Excerpts of Record; "NML Br." – Brief for Appellant; "Argentina Br." – Brief of Defendant-Appellee; "D.E." – docket entries in this appeal or in the district court proceedings below.

tual Launch Services Rights; NML does not seek to attach Argentina's satellites themselves. As a result, Argentina's exaggerated reliance on a 2011 district court decision involving an attempt to seize a *satellite* to be used in an intergovernmental research mission—*NML Capital, Ltd. v. SpacePort Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111 (C.D. Cal. 2011)—is misplaced. This case seeks to attach Argentina's contractual rights to launch satellites and the related pre-launch services. As the Supreme Court recognized in another case involving Argentina, even though boots or bullets may ultimately be used in military activities that could be undertaken only by a sovereign, the contract to buy that equipment is commercial activity. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614-15 (1992). So is CONAE's contract with SpaceX for the Launch Services Rights.

*Third*, Argentina's alternative ground in support of affirmance—that NML may not look to CONAE's assets to satisfy NML's judgments against Argentina—is meritless and was properly rejected below. Argentina's principal contention is that this Court should ignore its "core functions" test as the means of determining whether an entity is a separate "agency or instrumentality" of a foreign state, or instead a "political subdivision" inseparable from the foreign state. That would be a peculiar argument in any court of appeals bound by its own precedent, and it is especially so here because the standard Argentina proposes—looking only to whether the entity was created by an enabling statute, was given the power to hold and

3

sell property and to sue and be sued, and is primarily responsible for its own finances—is unworkable and invites abuse. This Court has properly rejected this standard in favor of the core functions test, which asks whether the sovereign entity is "an integral part of a foreign state's political structure or, by contrast, an entity whose structure and function is predominantly commercial." *Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Systems, Inc.*, 495 F.3d 1024, 1035 (9th Cir. 2007) ("*Cubic*") (citations omitted), *rev'd sub nom. on other grounds*, *Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009). And Argentina does not come even remotely close to demonstrating that the district court erred in applying that established standard and concluding that CONAE's functions are predominantly governmental.

This Court should reject Argentina's suggestion to break with precedent, and should affirm the portion of the district court's opinion recognizing that CONAE is Argentina's political subdivision, and thus is bound by Argentina's waiver of jurisdictional immunity and liable for Argentina's debts. The Court should reverse the district court's judgment in all other respects and remand the case to the district court for expedited discovery.

## ARGUMENT

**I.  Argentina's Launch Services Rights Are Being "Used For A Commercial Activity In The United States."**

Argentina is using its contractual Launch Services Rights for commercial activity in the United States, and those rights are thus available for attachment.  NML Br. 22-34; *see also* 28 U.S.C. § 1610(a)(1).  Argentina now is using—and will continue to use—its Launch Services Rights to obtain pre-launch services from SpaceX, as well as to keep the launch slots open and secure future services.  NML Br. 23-31.  And, because Argentina has contracted for SpaceX's launch services as would any private company, Argentina is using the Launch Services Rights for a "commercial activity in the United States."  *Id.* at 31-34.  Argentina's arguments to the contrary fail.

**A.  Argentina Is Currently Using Its Contractual Launch Services Rights.**

**1.  Argentina Is Using The Launch Services Rights To Acquire And Use SpaceX's Pre-launch Services.**

Argentina does not deny that it is currently working with SpaceX to tailor the satellites and launch vehicles to be compatible with each other.  To the contrary, Argentina has conceded that a satellite owner "need[s] to work with SpaceX" long before launch "so that the launch is tailored for the specifications of" the satellite.  Opp'n to Mot. to Expedite, D.E. 13, at 14 (9th Cir. Apr. 3, 2015).

5

a. Argentina instead argues that NML did not sufficiently plead these facts below and that the district court could not rely upon NML's evidentiary submissions on a motion to dismiss. *See* Argentina Br. 29-30. These arguments not only misrepresent NML's allegations, but they also ignore the settled law governing motions to dismiss.

*First*, NML sufficiently alleged that Argentina is using the Launch Services Rights to secure SpaceX's pre-launch services. Argentina ignores the Complaint's numerous allegations that Argentina has obtained—and is using—not just the rights to launch satellites, but also the rights to "launch services." *See* ER 64 ¶ 32 ("It is the commercial nature of those launch *services* and the commercial negotiation of them by CONAE that governs under the FSIA, not the purpose for which Argentina will use those launch *services*." (emphases added)); *see also*, *e.g.*, *id.* at 64 ¶ 33 ("Private companies . . . have contracted with SpaceX for commercial launch services, just as Argentina has done."). The Complaint further explains that Argentina's use of its rights encompasses both *current* "private launch services from SpaceX, as well as the launch services to be provided to CONAE by SpaceX" *in the future*. *Id.* at 64 ¶ 32.

Standing alone, these allegations state a claim. Federal Rule of Civil Procedure 8(a)(1) requires only "a short and plain statement." *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a complaint "does not need detailed

factual allegations"). Even where a plaintiff is a *party* to a contract, her complaint need "not point to the specific provisions in the [relevant] contract" to survive a motion to dismiss. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1042 (9th Cir. 2010). Because NML's allegations must be construed using "judicial experience and common sense" "in the light most favorable to the plaintiff," *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1048, 1051 (9th Cir. 2012), the district court was required to construe the Complaint as alleging that satellite launches require extensive pre-launch preparations, and that Argentina contracted for those rights. NML was not required to submit *evidence* specifically detailing those preparations; Rule 8 "simply calls for enough fact[s] to raise a reasonable expectation that *discovery* will reveal evidence to support the allegations." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (citation omitted; emphasis added). And here, most clearly, discovery of Argentina's contract with SpaceX would do just that.[2]

---

[2] Argentina erroneously implies that the FSIA imposes a heightened pleading standard. *See* Argentina Br. 17 n.10, 24. Rule 8(a) "governs the pleading standard in all civil actions," *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted); because the FSIA is "silen[t]" regarding the applicable pleading standard for actions against sovereigns, it does not displace these normal pleading rules, *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2257 (2014).

*Second*, the Complaint's exhibits amply support NML's allegations. Contrary to Argentina's assertion, not "[a]ll of [NML's] citations" in support of its claim come from documents outside the Complaint. Argentina Br. 30. Rather, as noted in the opening brief, NML attached to the Complaint SpaceX's manifest, which showed that SpaceX "was preparing" for launches nearly a year away. ER 95. Under Argentina's own logic, then, NML provided additional factual support for an allegation that the district court was already required to construe in its favor. *Akhtar v. Mesa*, 698 F.3d 1202, 1213-14 (9th Cir. 2012).

Moreover, when the district court ruled, the court had before it evidence of the exact nature of these preparations. In particular, when NML requested discovery to confirm the content of Argentina's contracts with SpaceX, NML submitted evidence showing that "[p]reparations for a satellite launch normally begin eighteen to twenty-fourth months" in advance, and describing the specific timing of various steps to ensure the "compatibility of the satellite with the launch vehicle." ER 27 ¶ 6.

Although NML's Complaint is sufficient, the district court was not bound to blind itself to this evidence. To the contrary, the district court was obliged to consider those documents attached and incorporated by reference to the Complaint. *See Akhtar*, 698 F.3d at 1213-14. And, while other evidence was "not physically attached" to the Complaint, the Complaint alleged the contents of Argentina's con-

tract with SpaceX, and "no party" here "questions" whether NML's additional evidence accurately described the nature of Argentina's rights to pre-launch services; the district court thus could have considered (and this Court should consider) this other evidence. *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015). The district court erred in dismissing NML's Complaint without considering all of its allegations and evidence.

*Third*, NML emphasized to the district court in opposing Argentina's motion to dismiss that the Complaint contained allegations that Argentina is currently using pre-launch services. Although Argentina has never denied that it is using the Launch Services Rights to obtain pre-launch services, NML nonetheless noted that Argentina is using those rights *both* for "holding launch slots" *and* for "all other preparatory steps." NML Opp'n, D.E. 30, at 19 n.10 (C.D. Cal. June 5, 2014). Then, at oral argument, NML explained that Argentina is "active[ly] us[ing]" the rights—both to obtain SpaceX's "ongoing activities" to prepare for the launches, and to "maintai[n] an open slot." ER 37:5-11. There can accordingly be no reasonable dispute that NML sufficiently alleged that Argentina is using the Launch

Services Rights to secure SpaceX's pre-launch services, and opposed Argentina's motion to dismiss on that basis.[3]

b.     Argentina next asserts that its exercise of the right to receive pre-launch services is not a "use" of property under the FSIA, but rather is the receipt of "contractual consideration" and thus supposedly is immune from attachment. Argentina Br. 31.  According to Argentina, the Launch Services Rights could be attached under the commercial-activity exception only if Argentina used those rights "in a separate, subsequent activity."  *See id.* at 32.  Argentina is wrong again, for several reasons.

*First*, Argentina's "subsequent activity" argument contravenes *Af-Cap*'s instruction that sovereigns "use" property when the property "is put into action [or]

---

[3]  In any event, "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."  *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).  NML's arguments that Argentina is using the Launch Services Rights to obtain pre-launch services and to secure future services are not distinct claims, but rather "separate *arguments* in support of a single claim," *id.* at 535—that is, that Argentina is using its Launch Services Rights for a commercial activity in the United States.  Accordingly, NML may "make any argument in support of that claim on appeal."  *Weissburg v. Lancaster Sch. Dist.*, 591 F.3d 1255, 1259 n.3 (9th Cir. 2010).  But if there were somehow doubt regarding the sufficiency of NML's allegations, this Court should not affirm, but rather vacate the judgment and remand with leave to amend the Complaint.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1034-35 (9th Cir. 2008).

put into service." 475 F.3d at 1091. Argentina clearly is doing that here: It is "put[ting]" the Launch Services Rights "into action" to demand services from SpaceX to ensure that SpaceX's rockets can successfully launch Argentina's satellites. This analysis is perfectly consistent with case law holding that sovereigns "use" property for commercial activity when they receive the "tangible benefits" that the "contracts" entitle them to. *In re 650 Fifth Ave.*, No. 08 Civ. 10934, 2014 WL 1516328, at *4, *19 (S.D.N.Y. Apr. 18, 2014). Argentina's contrary suggestion—that requiring performance of a contract over a period of time cannot constitute use—implies that a defense ministry with a prepaid contract for army boots never uses its contractual rights after signing the contract. Yet the Supreme Court has expressly rejected that theory, concluding that "a contract to buy army boots or even bullets is a 'commercial' activity." *Weltover*, 504 U.S. at 614.

*Second*, Argentina cites no precedent for its counterintuitive assertion that a party never uses rights under a contract that has yet to be fully performed. Argentina relies entirely upon cases, such as *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002), and *Cubic*, where creditors sought to attach money or judgments. Such fungible assets, however, are not inherently tied to any particular activity, and thus courts have required creditors to show that the funds are actually being used for the alleged commercial activity. *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 484 (2d Cir. 2007) (attachment improper

11

where property merely "*could have* been used to repay the Republic's debts"). Argentina's rights, in contrast, need no such confirmation; they can have only one use—securing SpaceX's launch and pre-launch services—which Argentina is currently employing, and which unquestionably is commercial activity. *See infra* Part I.B.

*Third*, Argentina's "subsequent use" argument conflicts with the "conversation[al]" and "plain meaning" of "use." *Af-Cap*, 475 F.3d at 1088. Rights to performance under executory contracts constitute property. 29 Williston on Contracts § 74:13 (4th ed.). And a party plainly uses its contractual rights when it demands that the other party perform. Indeed, if Argentina were not using its contractual Launch Services Rights to secure SpaceX's extensive pre-launch services, one wonders why SpaceX would provide these services to Argentina at all.

### 2. Argentina Is Using The Launch Services Rights To Secure Future Launches.

NML also alleged that Argentina is using the Launch Services Rights to secure the right to launch satellites in September 2015 and September 2016. NML Br. 27-31; *see also* ER 11, 63-64 ¶¶ 30-34. This is precisely the type of activity that *Af-Cap* held constitutes a "use" under 28 U.S.C. § 1610(a)'s commercial-activity exception: Argentina is "using" its contractual Launch Services Rights "to secure the services of an American corporation." 475 F.3d at 1092. That alone is sufficient under the FSIA, and the district court erred in concluding otherwise.

Argentina argues that this "use" is inadequate because it is supposedly just the "passive" "maintenance of contract rights." Argentina Br. 28. That is not what *Af-Cap* holds. *Af-Cap* proffered a letter of credit "used . . . to secure the services of an American corporation" as the type of property satisfying this Court's definition of "use." 475 F.3d at 1092 (citing letter of credit in *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1175 (5th Cir. 1989)). But, under Argentina's proposed rule, that same letter of credit would not have satisfied Section 1610(a) because the letter of credit's use also was "passive": It sat, waiting to be used in case the debtor defaulted. Thus, if the *Atwood* sovereign was using the letter of credit, then Argentina surely is using its contractual Launch Services Rights.

In any event, use does not require that the relevant property must have been employed previously for its intended commercial activity. The Second Circuit—which adopted *Af-Cap*'s "use" definition—has explained that a creditor need not show that the particular property is actually being exploited at the time of attachment, provided that there is evidence that the sovereign "clearly intends to put, by virtue of some formal designation or other specific means," the property to use in a commercial activity. *Exp.-Imp. Bank v. Grenada*, 768 F.3d 75, 90-91 (2d Cir.

2014).[4]  And here, Argentina "clearly intends" to use its Launch Services Rights to launch its satellites using SpaceX's facilities.

### B.  Argentina's Usage Is Commercial Activity.

Not only is Argentina using its Launch Services Rights; that use is "commercial activity."  NML Br. 31-34.  The Supreme Court has made clear that a sovereign engages in commercial activity when "the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce."  *Weltover*, 504 U.S. at 614 (citation omitted).  Argentina's engagement with SpaceX is plainly commercial activity:  SpaceX "is in the business of providing private, commercial space transport," ER 64 ¶ 32, and "over 60%" of SpaceX's launches "are for commercial customers" that have "contracted with SpaceX for commercial launch services, just as Argentina has done," *id.* at 64 ¶¶ 32-33.  The Complaint plainly alleges that Argentina's use of its Launch Services Rights is commercial activity.

Argentina's contrary arguments focus on precisely the consideration that the FSIA deems irrelevant:  the sovereign's purposes.  Argentina argues that, because

---

[4] *Export-Import Bank*'s rule clarifies the distinction between the immunity of fungible assets versus that of non-fungible assets (*e.g.*, Argentina's Launch Services Rights):  Evidence of the sovereign's intended use is a *necessary* condition to attach fungible assets but such evidence is a *sufficient* condition to attach non-fungible assets that have only one use.

its satellites—*once launched*—purportedly will be used for sovereign purposes, the Launch Services Rights cannot be "commercial, notwithstanding that private parties may engage in similar conduct." Argentina Br. 39. But the Supreme Court rejected this reasoning in *Weltover* when it explained that "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." 504 U.S. at 614-15; *see also NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 259-60 (2d Cir. 2012) (finding irrelevant "Argentina's asserted eleemosynary or governmental motives"). It is irrelevant that the foreign state might later put those boots or bullets to a sovereign use; the contract itself is the relevant commercial activity. Argentina's Launch Services Rights thus also are "commercial" activity because private companies can—and do—similarly use contracts with SpaceX to acquire launch services. *See* ER 64 ¶¶ 32-33.

Argentina attempts to avoid this straightforward conclusion by mischaracterizing NML's lawsuit as seeking to attach Argentina's *satellites*, rather than its contractual Launch Services Rights. *See* Argentina Br. 2-3, 12-15, 18, 20-21, 33 n.13, 36-39. As Argentina notes, *see id*. at 38-39, a district court previously held that Argentina was not using one of its environmental satellites for a commercial activity when it used that satellite to collect environmental data as part of an intergovernmental mission. *Spaceport*, 788 F. Supp. 2d at 1120-25. The court reasoned

15

that "a private party simply cannot be a part of th[at] intergovernmental relationship." *Id.* at 1124. By contrast, here, NML seeks to attach *only* Argentina's contractual Launch Services Rights; Argentina's satellites are not at issue. Because a private party *can* contract to launch satellites through SpaceX's facilities, Argentina is engaged in commercial activity.

Argentina contends that ruling in NML's favor would permit judgment creditors to interfere with immune sovereign property by attaching the contractual rights necessary to "use" the immune property. Argentina Br. 39-40. Argentina is mistaken.

*First*, Argentina's argument that the FSIA prohibits creditors from attaching commercial contracts that facilitate sovereign activities contravenes *Weltover*'s example of the contract to purchase army boots. Whereas the boots themselves might not be attachable once on soldiers' feet, contracting to purchase them *is* commercial activity. 504 U.S. at 614-15.

*Second*, Argentina relies on *Colella v. Republic of Argentina*, No. C 07-80084 WHA, 2007 WL 1545204, at *6 (N.D. Cal. May 29, 2007), but that court held only that creditors could not attach an airplane used solely to transport a head of state; although the airplane was in the United States for periodic maintenance from a private company, the airplane itself, rather than any contractual maintenance rights, had "only a passing connection" to commercial activity and thus was

16

not "used" for commercial activity. *Id.* at *6. But that reasoning would arguably be relevant here only if NML were seeking to attach the proverbial airplane—Argentina's satellites—which is not the case.

*Third*, in any event, Argentina's contractual Launch Services Rights are hardly incidental to a sovereign activity, nor do they have a "passing" connection to commerce. Launching a satellite with SpaceX is a multi-year process requiring frequent interactions with SpaceX and costing at least $61 million per launch. SpaceX, Capabilities & Services (Standard Payment Plan (2016 Launch)), *at* http://www.spacex.com/about/capabilities (last accessed July 7, 2015). Private companies engage SpaceX for identical services.

*     *     *

Argentina is using the Launch Services Rights for a commercial activity in the United States. The district court accordingly erred by concluding that the Complaint did not state a claim that those rights are attachable under the FSIA.

## II.  CONAE Is Argentina's Political Subdivision, And Therefore Is Bound By Argentina's Waiver Of Immunity From Jurisdiction And Liable For Its Debts.

Argentina alternatively contends that the district court erred in holding that CONAE, Argentina's national space agency, is a political subdivision of Argentina, bound by Argentina's waiver and liable for its debts. Argentina Br. 40-50; *see*

17

*also* ER 6-10.  The district court reached the correct conclusion on these issues, and Argentina's arguments are meritless.

Indeed, Argentina's central argument—that the district court erred by applying this Court's "core functions" test, and should instead have applied the "alter ego" test articulated in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 624 & nn.13-14 (1983) ("*Bancec*")—*assumes* that CONAE is a "legally distinct" "agency or instrumentality."  *E.g.*, Argentina Br. 40, 41, 42, 46, 47.  But *Cubic* makes clear that courts must *first* apply the core functions test to determine whether a sovereign entity is indeed a separate agency or instrumentality serving a commercial function, or instead is an inseparable political subdivision serving governmental functions.  495 F.3d at 1035.  Because CONAE's space-exploration mission is a governmental function, Argentina's waiver of jurisdictional immunity gave the district court jurisdiction over CONAE, and Argentina's creditors can look to assets held in CONAE's name to satisfy their judgments.

### A. The Core Functions Test Governs Whether CONAE Is A Separate Legal Person For Purposes Of Both Liability And Jurisdiction Under The FSIA.

Argentina attempts to avoid the core functions test on several grounds, but none justifies a departure from that well-established test, which this Court adopted in *Cubic*.  *See* NML Br. 35-43.

18

1.     Argentina first contends that applying the core functions test would improperly "circumvent" or "create an exception to" *Bancec*'s holding that "'government instrumentalities established as juridical entities distinct and independent from their sovereign'" are "entitled to a strong presumption that they are separate from their parent states and thus not liable for the state's debts." Argentina Br. 41, 44-45 (quoting *Bancec*, 462 U.S. at 626-27). This argument fails.

An entity must establish that it is an "agency or instrumentality" under 28 U.S.C. § 1603(b) before it is "presum[ed]" separate under *Bancec*. *See* NML Br. 34, 41-42. Under the FSIA, an agency or instrumentality is any entity that is (1) "a *separate* legal person," (2) "an organ of a foreign state . . . or a majority of whose shares or other ownership interest is owned by a foreign state," and (3) "neither a citizen of a State of the United States . . . nor created under the laws of any country." 28 U.S.C. § 1603(b) (emphasis added). In other words, an entity must prove that it is "separate" to establish that it is an "agency or instrumentality"; courts cannot simply assume separation.

As this Court has held, the core functions test determines whether a governmental entity is separate from the foreign state, or is a political subdivision inseparable from the foreign state. *Cubic*, 495 F.3d at 1034-35. Holding CONAE liable for Argentina's conduct thus would not create any "exception" to *Bancec* because

*Bancec*'s standards do not apply unless and until the entity has established that it is an agency or instrumentality rather than an arm of the state itself.

To the extent that Argentina argues that *Bancec*'s presumption applies to *any* state entity, regardless of function, *Bancec* forecloses that position. The Supreme Court held that a commercial bank, whose assets reverted upon dissolution to Cuba's Ministry of Foreign Trade, was Cuba's alter ego and therefore liable for a counterclaim against Cuba. *Bancec*, 462 U.S. at 631-32 & n.22. But to reach this outcome, the Court first needed to determine the relationship between the Ministry of Trade, which had assumed the bank's functions, and the Cuban government. The Court explained that, whereas the commercial bank was a separate "agency and instrumentality," the Ministry of Trade was "'*no different than the Government of which its minister is a member*.'" *Id.* at 618 n.5 (quoting *Banco Nacional De Cuba v. Chase Manhattan Bank*, 505 F. Supp. 412, 425 (S.D.N.Y. 1980)) (emphasis added). The Court's treatment of the Ministry of Trade thus refutes Argentina's contention that *Bancec* established a blanket presumption that governmental entities are separate from the foreign state.

Argentina also argues that *Bancec* "decline[d] to adopt" the core functions test because it did not determine the status of the bank on that basis. Argentina Br. 46 (quoting *Bancec*, 462 U.S. at 633 n.27); *see also id.* at 47 n.17. But *Bancec* determined only that there was no need to "adopt such a standard *in* [*that*] *case*" be-

cause the Court's holding was "based on other grounds." 462 U.S. at 633 n.27 (emphasis added). In particular, the entity was a commercial bank—and thus plainly an "agency or instrumentality" entitled to a presumption of separateness—so addressing the governing legal test was (unlike here) not necessary.

2. Because Argentina cannot show that CONAE's core function is commercial rather than governmental, *see infra* Part II.B, Argentina proposes an alternate test based on characteristics cherry-picked from *Bancec*'s description of a separate "'government instrumentality'": that it (1) has "'an enabling statute'" defining its powers and governance, (2) is "established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued," and (3) is "'primarily responsible for its own finances.'" Argentina Br. 42 (quoting *Bancec*, 462 U.S. at 624).

Argentina's test is rigged, and wrong. It ignores *Bancec*'s statement that the "typical government instrumentality . . . is run as a distinct economic enterprise"—*i.e.*, serves a *commercial*, not *governmental*, function. 462 U.S. at 624-25. In addition, Argentina's first factor—the existence of an "enabling statute"—effectively encompasses *any* state entity. Argentina's second factor—the ability to hold property or sue in its own name—also is flawed because "'any nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself.'" *Cubic*, 495 F.3d at

1034-35 (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994)). And the core functions test already addresses Argentina's third factor—whether the entity is "primarily responsible for its own finances." *See Cubic*, 495 F.3d at 1036. Argentina's proffered standard thus provides no additional useful considerations and no basis for this Court to reject its own precedent adopting the core functions test.

3.   Argentina next argues that the core functions test cannot "deal with questions of substantive liability," because it has been applied only to FSIA provisions that "impose different jurisdictional standards" on "the state itself" and its instrumentalities. Argentina Br. 44-46. That assertion cannot be squared with the relevant case law and would needlessly complicate the FSIA's administration.

Every court of appeals confronted with the issue has applied the core functions test to liability decisions. *See Compagnie Noga D'Importation & D'Exportation S.A. v. Russian Fed'n*, 361 F.3d 676, 687-88 (2d Cir. 2004) ("*Noga*"); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003); *see also* NML Br. 37 & n.4. Argentina says that *Noga* "did not apply the 'core functions' test." Argentina Br. 45 n.16. In fact, *Noga* called that test the "most developed" of "the federal common-law principles" on which it based its holding that the foreign state was not separate from its sub-unit. 361 F.3d at 687-88. And Argentina erroneously denies that *Roeder* addressed "liability," Argentina Br. 45

22

n.16, even though *Roeder* plainly addressed liability under an FSIA amendment providing that certain entities "'shall be liable'" for state-sponsored terrorism, which the D.C. Circuit held "provides a cause of action" rather than a basis for jurisdiction. 333 F.3d at 234-35 & n.3 (quoting 28 U.S.C. § 1605 note).

Argentina also ignores *SerVaas Inc. v. Republic of Iraq*, No. 10-828-cv, 2011 WL 454501, at *3 (2d Cir. Feb. 16, 2011), and *Wye Oak Technology, Inc. v. Republic of Iraq*, 666 F.3d 205, 215 (4th Cir. 2011). Although these cases addressed jurisdiction under the FSIA's commercial-activity exception rather than liability, neither case involved any FSIA provision that "impose[s] different jurisdictional standards" on foreign states and their instrumentalities. Argentina Br. 45. Instead, *SerVaas* and *Wye Oak* applied the core functions test to determine whether the conduct of a foreign ministry could be imputed to the foreign state, and vice versa. *SerVaas*, 2011 WL 454501, at *3; *Wye Oak*, 666 F.3d at 215.[5]

---

[5] In any event, courts regularly determine the conduct attributable to a state for liability and jurisdictional purposes using the same tests. *See*, *e.g.*, *Sachs v. Republic of Austria*, 737 F.3d 584, 587 (9th Cir. 2013) ("traditional agency principles" govern state's responsibility for agent's conduct for both liability and jurisdiction), *cert. granted sub nom. OBB Personenverkehr AG v. Sachs*, 135 S. Ct. 1172 (2015); *compare Bancec*, 462 U.S. at 629-30 (veil piercing standard for liability), *with*, *e.g.*, *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 199 F.3d 94, 98 (2d Cir. 1999) (applying *Bancec* to jurisdiction).

Argentina nonetheless contends that the core functions test cannot apply to liability because *Bancec* held that the FSIA "is not intended to affect the substantive law of liability." Argentina Br. 44. But Argentina does not contend that a foreign state's political subdivisions have ever been considered separate from the state. Holding political subdivisions liable for foreign states' acts according to the core functions test thus would not "affect" any law of substantive liability. The core functions test simply recognizes that political subdivisions *are* part of the state. Moreover, as noted, the FSIA's "agency or instrumentality" test requires finding not only that the entity is sufficiently connected to the state such that it is "an organ of a foreign state," but also that the entity is "a separate legal person." 28 U.S.C. § 1603(b). In other words, Congress expressly contemplated the existence of governmental entities that are not separate or distinct from the foreign sovereign. The core functions test identifies those entities.

Moreover, practical judicial administration also favors applying the core functions test to evaluate both liability and jurisdiction among political subdivisions and foreign states. Courts require "a principled and objective standard" applicable across cases, not the "different ad hoc" approaches that Argentina's arguments would require. *Johnson v. United States*, — U.S. —, No. 13-7120, 2015 WL 2473450, at *5 (June 26, 2015); *see also McBride v. Lopez*, — F.3d — , No. 12-17682, 2015 WL 3953483, at *4 (9th Cir. June 30, 2015) (adopting test because

it was "straightforward and conceptually simple to apply"). Here, applying the core functions test to determine jurisdiction but not to determine liability would create a needlessly complicated patchwork of entities with different statuses under different tests, as Argentina does not deny. *See* NML Br. 39, 41; *see also* Argentina Br. 46 n.17. The core functions test is sufficiently robust to address both liability and jurisdiction.[6]

4.      Argentina argues alternatively that the only entities to which a court may impute a foreign state's liability are a small subset of "governmental departments, ministries, or treasuries that are part and parcel of foreign state governments," such as ministries of foreign affairs or defense. Argentina Br. 48. Because CONAE does not fall within this limited definition, Argentina maintains, CONAE is a separate agency and instrumentality. *Id.* at 48-49. Argentina is wrong. There is no basis for a rule limiting the scope of entities that are political subdivisions, and thus inseparable from the state; the core functions test does not

---

[6] Argentina also suggests that *Bancec* found the core functions test unworkable because "'the concept of a "usual" or "proper" governmental function changes over time and varies from nation to nation.'" Argentina Br. 46 n.17 (quoting *Bancec*, 462 U.S. at 633 n.27). That is incorrect. *Bancec* "based [its decision] on other grounds." 462 U.S. at 633 n.27. And since then, courts—including this one—have had little trouble applying the core functions test. *See* NML Br. 35-38 (collecting cases).

make any distinction among non-commercial entities whose core functions are governmental.

In any event, CONAE satisfies Argentina's flawed standard. Argentina cites *Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001), in support of its new rule, Argentina Br. 48-49, and that case held that Russia's Ministry of Culture was a political subdivision of the Russian state, not an agency or instrumentality, *Magness*, 247 F.3d at 613 n.7. CONAE is no less vital to the Argentine government than a culture ministry is to the Russian state. Thus, even under Argentina's flawed test, CONAE is a political subdivision of—and inseparable from—Argentina.

5. Argentina denies that the core functions test "accords with international law." Argentina Br. 47. But it ignores the U.N. principles cited by NML, *see* NML Br. 40-41, which treat as part of the state any entity that "exercise[s] elements of the governmental authority," Draft Articles on Responsibilities of States for Internationally Wrongful Acts, art. 4(2), 7. Indeed, *Noga* explained that separating "the acts of a sovereign" from "the acts of one of its governmental organs" "finds no basis in international law." 361 F.3d at 688-89.

\* \* \*

In this Circuit, an entity protected by the FSIA is a "political subdivision" if its core functions are governmental, and is an "agency or instrumentality" if its

core functions are commercial. Because a political subdivision is inseparable from the foreign state, a foreign state's creditors can look to the political subdivision to satisfy the foreign state's unpaid judgments.

### B. CONAE Is Not A Separate Legal Person.

The district court also correctly concluded that CONAE is Argentina's political subdivision. Indeed, Argentina's brief does not even argue that CONAE's core functions are commercial. Because CONAE's core functions instead are governmental, it is a political subdivision of Argentina bound by its waiver of immunity and liable for its debts. *See* ER 10.

CONAE's charter and public documents reflect that it is responsible for a governmental function—managing Argentina's "overall space policy," which is "of great interest for the National State." ER 60 ¶ 20 (quoting *id.* at 77-78). Argentina contends that this governmental function is not "indispensable," Argentina Br. 49, but that is not the test: "The question" is "whether [the entity] is inherently a part of the political state *or a commercial actor*." *Cubic*, 495 F.3d at 1035 (emphasis added). Moreover, Argentina admits that "the conduct of foreign affairs" *is* "indispensable" to foreign states, Argentina Br. 49, and it does not dispute that CONAE engages in Argentina's foreign relations, including treaty implementation, *see* ER 2, 10 n.7, 61 ¶ 22, 79.

27

CONAE also is controlled by, and dependent on, the Argentine state. Argentina contends that CONAE does not rely *wholly* on legislative appropriations, and thus is "not 'bound up' in or an 'integral part of' the Republic's governmental structure." Argentina Br. 49. It notes that, under the decree authorizing CONAE's activities, CONAE may generate revenue from intellectual property and "services," *id*. at 43 (citing ER 80), but Argentina offered no evidence below to demonstrate whether CONAE actually received revenue from these sources, or whether these sources are anything but an insubstantial part of its budget. To the contrary, CONAE's "financing mechanism" must be "approved by the National Executive Branch" and is predominantly if not solely funded by the "national budget" subject to "parliamentary approval." ER 61-62 ¶ 23; ER 78, 80. Although CONAE's charter nominally grants it "financial independence," that refers only to CONAE's authority to direct the use of its share of the national budget. *Id*. at 78.

Argentina cites several cases in which, it says, courts have held that other foreign state entities similar to CONAE meet the FSIA's definition of "agency or instrumentality." *See* Argentina Br. 43, 44 n.5, 49 (citing *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 148 (2d Cir. 2014); *Seijas v. Republic of Argentina*, 502 F. App'x 19, 22-23 (2d Cir. 2012); *EM Ltd. v. Republic of Argentina*, No. 08 Civ. 7974, 2009 WL 3149601, at *6 (S.D.N.Y. Sept. 30, 2009), *vacated in part on other grounds*, 2010 WL 3910604 (S.D.N.Y. Sept. 30, 2010); *Cal. Dep't of Water*

*Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008); *Alperin v. Vatican Bank*, 360 F. App'x 847, 849 (9th Cir. 2009); *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007) (per curiam)). Yet *none* of these cases addressed the standard for determining whether a foreign-state entity constitutes a "separate legal person." 28 U.S.C. § 1603(b)(1).

*Seijas* held that a *commercial bank*—precisely the sort of entity that *Bancec* held is an "agency or instrumentality"—was not Argentina's alter ego. 502 F. App'x at 22. The central question in the other four circuit court decisions (*European Community*, *Powerex*, *Alperin*, and *Peninsula*) was whether the entities in question were entitled to FSIA immunity, which turned on whether those entities were "organ[s]" of a foreign state. *See* 28 U.S.C. § 1603(b)(2). The plaintiffs in those cases did not contend that the entities were "separate legal person[s]," and it would not have mattered if they were not because a foreign state's "organ" enjoys immunity (or waiver thereof) regardless of whether it is a separate "agency or instrumentality" or an inseparable "political subdivision." *Id.* § 1603(a).[7]

---

[7] *European Community* held that "an international organization created by multiple states" had "independent legal status" and was "not a political subdivision of a foreign state," 764 F.3d at 143-44 & n.16, 147, but that says nothing about the legal status of a single state's internal ministry.

*EM* also did not address what test should be applied for determining whether a foreign state entity constitutes a "separate legal person." Instead, the district court accepted Argentina's unrebutted evidence that the entity at issue—another commercial bank—was a separate legal entity. *EM*, 2009 WL 3149601, at *6. Unlike the plaintiff in *EM*, however, NML has pleaded specific facts giving rise to a plausible inference that CONAE is not a separate legal entity. *See* NML Br. 43-46. That is all that is required at this stage.

\*      \*      \*

Because CONAE's core functions are governmental, it is a political subdivision of Argentina, subject to Argentina's waiver of immunity and liable for Argentina's debts. And because Argentina (through CONAE) is using the Launch Services Rights commercially (in service of CONAE's governmental function), those Launch Services Rights are subject to attachment here.

## CONCLUSION

This Court should reverse the district court's judgment of dismissal and remand this case for further proceedings, including discovery.

Dated: July 16, 2015                    Respectfully submitted,


HAROLD A. BARZA                         /s/ Matthew D. McGill
BRUCE E. VAN DALSEM                     THEODORE B. OLSON
IAN S. SHELTON                          MATTHEW D. MCGILL
QUINN EMANUEL URQUHART &                SCOTT P. MARTIN
SULLIVAN, LLP                           CHRISTOPHER B. LEACH
865 South Figueroa Street, 10th Floor   GIBSON, DUNN & CRUTCHER LLP
Los Angeles, CA  90017                  1050 Connecticut Avenue, N.W.
Telephone: 213.443.3000                 Washington, DC  20036-5306
Facsimile: 213.443.3100                 Telephone: 202.955.8500
                                        Facsimile: 202.467.0539

STEVEN A. ENGEL                         ALEXANDER K. MIRCHEFF
DECHERT LLP                             GIBSON, DUNN & CRUTCHER LLP
1095 Avenue of the Americas             333 South Grand Avenue
New York, NY  10036                     Los Angeles, CA  90071-3197
Telephone: 212.698.3500                 Telephone: 213.229.7307
Facsimile: 212.698.3599                 Facsimile: 213.229.6307

*Attorneys for Plaintiff-Appellant NML Capital, Ltd.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,879 words, as determined by the word count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.


Date:  July 16, 2015            /s/ Matthew D. McGill
                                MATTHEW D. MCGILL
                                GIBSON, DUNN & CRUTCHER LLP
                                1050 Connecticut Avenue, N.W.
                                Washington, DC  20036-5306
                                Telephone: 202.955.8500
                                Facsimile: 202.467.0539

                                *Attorney for Plaintiff-Appellant NML Capital, Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Reply Brief for Appellant with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 16, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: July 16, 2015

/s/ Matthew D. McGill
MATTHEW D. MCGILL
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorney for Plaintiff-Appellant NML Capital, Ltd.*